## UNITED STATES DISTRICT COURT
## DISTRICT OF DELAWARE

| | |
|---|---|
| YOU MAP, INC.,<br><br>      Plaintiff,<br><br>v.<br><br>SNAP INC., ZENLY S.A.S., ZENLY INC., EVAN SPIEGEL, ANTOINE MARTIN, ALEXIS BONILLO, ALEXANDRE BERNARD, NICOLAS DANCIE, NOE LOTERMAN, NICOLAS FALLOURD, JONATHAN ETAIX, CHRISTOPHE KEREBEL and ROY MARMLESTEIN<br><br>      Defendants. | Civil Case No.:<br><br><br><br><br><br><br><br><br><br><br><br>January 31, 2020 |

## COMPLAINT

The plaintiff, You Map, Inc. ("**Plaintiff**" or "**YouMap**"), by and through its undersigned counsel, hereby complains of Defendants Snap Inc. ("**Snap**"), Zenly SAS, Zenly Inc. (together with Zenly S.A.S., "**Zenly**"), Evan Spiegel, Antoine Martin, Alexis Bonillo, Alexandre Bernard, Nicolas Dancie, Noe Loterman, Nicolas Fallourd, Jonathan Etaix, Christophe Kerebel and Roy Marmlestein (collectively, the "**Defendants**"), as follows:

## I.

## PRELIMINARY STATEMENT

1.      YouMap's founder, Stephen Constantinides, invested a significant amount of capital into YouMap over the past several years to create the novel, cutting-edge, location-based social media and mapping trade secrets that are embedded within its mobile application, YOUMAP ("**YOUMAP**").

2.      While YouMap was refining those trade secrets in late 2016 in advance of YOUMAP's public release in July 2017, Snap and Zenly, along with the other Defendants, colluded to steal, and then eventually stole, YouMap's technologies that each was then missing from its respective social media and mapping applications, namely SNAPCHAT and ZENLY.

3.      After stealing YouMap's technologies, Snap and Zenly incorporated the stolen technology into their respective applications. They, then, knowing from YouMap's social media releases and other publicity, that YouMap was set to release YOUMAP, rushed it into the market, beating YouMap's release of YOUMAP by several days. With that, Snap and Zenly obtained a tremendous head start over YouMap, damaging YouMap in the process and otherwise gaining market share, steering public sentiment in their favor on YouMap's vision and technology, and misappropriating goodwill and critical acclaim by telling the market Snap and Zenly had developed the technologies they stole from YouMap.

4.      Back in or about 2011, Zenly had begun development of Alert.Us, an application geared for parents to track their "loved ones" whereabouts, as depicted in Figure 1, below:

**FIGURE 1:**



5.      Eventually released in or about 2012 under the name "Alert.Us," it was an abysmal failure. After recognizing Alert.Us would never have commercial success, Zenly went back to the drawing board. Having realizing their strategy of marketing to parents a technology to geographically locate their kids was failing, in June 2014, it rebranded Alert.Us into ZENLY, and then started an advertising campaign under its new moniker with a goal of organically growing its user base, the rebranding of which before February 2017 is set forth in Figure 2, below:

**FIGURE 2:**

**ZENLY**



At its core, ZENLY remained a mobile application to locate people, it did not have any functionality to display semantic information. Still unhappy with its growth in 2014 and 2015, Zenly decided it needed more capital for its operations. So, it raised, in just 28 days ending in

September 2016, $25,500,000, a majority of which was by Benchmark Capital. That was in addition to the $11,200,000 raised in 2015. .

6.      Although the more than $33,000,000 of investment was important to Zenly, nothing became more precious to Zenly's future than Benchmark Capital's relationship with Snap. By the time Benchmark Capital invested in Zenly, Snap had been internally developing a module for SNAPCHAT called "Snap Map." That module was supposed to provide SNAPCHAT's users with the functionality of YOUMAP and ZENLY by geolocating SNAPCHAT's users "snaps" — a micro-communication feature between SNAPCHAT's user's contacts. However, Snap Map had not been developed to Mr. Spiegel's satisfaction, so he directed Snap to investigate the market to purchase the technology its own developers were unable to perfect.

7.      During the relevant period, Benchmark Capital was a significant shareholder of Zenly and Snap. In addition to the $22,500,000 invested in Zenly, Benchmark Capital purchased more than 120 million shares of Snap's stock. For context, Benchmark Capital's stockholdings in Snap were valued at over $2,900,000,000, based on Snap's March 2, 2017 opening market price in its initial public offering on the New York Stock Exchange.

8.      As one of Snap's largest investors, Benchmark Capital had the right to, and did, elect a director to Snap's board of directors each year from 2012 up through 2018. That designee was Mitch Lasky, who served thereon during that period.

9.      Overlapping Benchmark Capital's right to appoint at least one Snap director is Benchmark Capital's right to appoint at least one director to Zenly's board of directors. In or about September 2016, Benchmark Capital did elect one of its partners, Peter Fenton, to Zenly's

board of directors, who held such directorship until, upon information and belief, Snap's acquisition of Zenly in spring of 2017.

10.     To be clear, Mr. Fenton and Mr. Lasky, long-standing partners, colleagues and friends at Benchmark Capital, were respectively sitting at the same time on the boards of Zenly and Snap.

11.     Recognizing the value of Benchmark Capital's incestuous relationship with Snap and Zenly, Mr. Fenton said, in September 2016, "Being able to see where your friends are and who they are with opens up a world of product opportunities, which if executed successfully will lead to one of the iconic companies of our lifetime." With that quote, Mr. Fenton was mapping out Benchmark Capital's strategy to cause Zenly and Snap to enter into a purchase and sale transaction so that Benchmark Capital could garner an accretive return on its investment. In other words, in or around September 2016, Benchmark Capital's representatives, Mr. Fenton and Mr. Lasky, were conspiring with Snap and Zenly, and their respective representatives, which includes some or all of the individual Defendants, to broker a deal between Snap and Zenly. If successfully brokered (which it was), Benchmark Capital would reap hundreds of millions, if not billions, of dollars in return on its investment.

12.     Mr. Fenton had a more difficult job, though. He had to ensure Zenly's intellectual property, which included ZENLY, was sufficiently valuable to and compatible with Snap's SNAPCHAT. That is because Snap was conducting its initial public offering within six months of Benchmark Capital's investment in Zenly, and Mr. Fenton knew Benchmark Capital had more risk (and a greater return) in Snap than with Zenly. Put another way, Mr. Fenton was not incentivized to broker a sale between Zenly and Snap that could result in a technology, publicity or financial nightmare.

13.     Having insiders at Zenly and Snap, Benchmark Capital was best positioned, and financially incentivized, to make Zenly or its assets appear attractive for Snap to buy. Both Snap and Zenly would benefit, and eventually did benefit, from such a transaction. But, Zenly was aware it was missing a vital piece of technology for ZENLY. It had been unable to revolutionize ZENLY, which was built on stale technology. Nor did Zenly have the necessary market traction for Snap to be interested in buying Zenly's assets or equity. Zenly knew it needed to improve ZENLY's technology, before any sale could be brokered.

14.     In 2016, Zenly became aware of YouMap's beta testing of YOUMAP (the "**Beta Testing**"). Antoine Martin, a co-founder and the President of Zenly, told YouMap in an email on November 16, 2016 that Zenly and its "whole team" had been following YouMap's "work for a few years" and they "are all big fans of the stuff you did with National Geographic & now YouMap."

15.     Using their fandom of YouMap as a façade to gain access to the Beta Testing, Mr. Martin then confessed that ZENLY'S mapping technology was a critical issue for Zenly and that Zenly would "LOVE to get to test [YouMap's] beta out." Having admitted to Zenly's nefarious motive, Mr. Martin continued: gaining access to the Beta Testing "would make [Zenly's] product design & maps team ultra happy if you say yes!" YouMap did not respond to, nor was it made aware of during the relevant period, that email.

16.     A reason why Mr. Martin adamantly sought access to the Beta Testing is because, during the November 2016 period, Zenly was in the midst of working on a "totally redesigned" ZENLY, so that, according to the Defendants' plan, Mr. Fenton and Mr. Lasky could broker a deal between Snap and Zenly. ZENLY had to be "totally redesigned" because it was behind the

technology curve. Thus, Zenly needed, and desperately sought, access to the Beta Testing to steal new technology.

17.     What is more corroborative of the Defendants' plan is that Zenly and its representatives had met with Snap and its representatives on, or in the days leading up to, November 15, 2016, to discuss YouMap, YouMap's technologies, the Beta Testing and/or updating the technologies in ZENLY. For example, Mr. Fallourd tweeted on November 15, 2016, a picture of Snap's Spectacles — before they were available for online purchase — against a backdrop picture of "Zenly," captioned: "Guess what's happened today?" including hashtags of, among others, #snapchat #zenly #app #tech #fomo. What happened on November 15, 2016, is that Zenly and Snap solidified their plan to steal YouMap's technologies. Then, on the next day, November 16, 2016, Mr. Martin — without coincidence, but, rather, in furtherance of the Defendants' plan – sent his email to YouMap, desperately trying to win over YouMap with glowing accolades and praise.

18.     After that, various representatives of Zenly requested access to the Beta Testing, including Zenly's officers and directors. While some of Zenly's representatives initially requested access to the Beta Testing disclosing their affiliation to Zenly, others did not. That is because YouMap refused to grant access to any individual affiliated with a YouMap competitor, such as Zenly, and directed its service provider for the Beta Testing not to include any YouMap competitors in the Beta Testing. So, instead, Zenly representatives, who had initially sought invitation in November 2016, concealed their affiliation with Zenly by seeking to register or re-register in January or February 2017 for the Beta Testing using their *private* email addresses or an alias. Unbeknownst to YouMap, its service provider for the Beta Testing granted access for the Beta Testing to certain Defendants without YouMap's advance consent.

19.     Before gaining access to the Beta Testing, however, all participants, including those affiliated with Zenly, were required to, and did, agree to various terms and conditions, including confidentiality, non-use and nondisclosure obligations.

20.     Using YouMap's confidential information and trade secrets in an unauthorized and unlawful manner, Zenly vastly improved ZENLY'S technology and then sold it to Snap for approximately $213,000,000 in or about May 2017, as set forth in Snap's SEC filings publicly available on the SEC's EDGAR system (the "**Zenly/Snap Deal**"). Afterwards, Snap and Zenly were aware YouMap was intending to publicly release YOUMAP. So, Zenly and Snap engaged in an Homeric effort to integrate the stolen technologies into their respective mobile applications before YouMap could beat them into the market with its release of YOUMAP.

21.     Zenly and Snap would not have consummated the Zenly/Snap Deal without having first stolen YouMap's confidential information and trade secrets, and then incorporating it into ZENLY and then, ultimately, into SNAPCHAT.

22.     As a direct and proximate cause of the Defendants' unlawful conduct, YouMap has suffered, and continues to suffer, substantial injuries.

## II.

## JURISDICTION AND VENUE

23.     This Court has federal question subject matter jurisdiction under 28 U.S.C. § 1331 as this action arises under The Defend Trade Secrets Act of 2016, 18 U.S.C. § 1836.

24.     Venue is proper in this judicial district under 28 U.S.C. § 1391(b)(2) as a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated, in this judicial district.

### III.

### PARTIES

25.     Plaintiff You Map Inc. is a Delaware corporation having its principal place of business in New York, NY.

26.     Defendant Snap Inc. is a Delaware corporation with a registered office care of Corporation Service Company, 251 Little Falls Dr., Wilmington, DE 19808, and is registered as a foreign business corporation in New York maintaining a registered office, and appointing a registered agent in New York, care of Corporation Service Company, 80 State St., Albany, NY12207-2543. Snap conducts substantial business in, and generates a significant amount of revenue from citizens and residents of, New York from its offices at 229 W. 43rd St., New York, NY. Snap has entered and continues to enter into contracts and agreements with citizens and residents of New York.

27.     Defendant Zenly S.A.S. is a French limited liability company by shares with at 4-6 Passage Louis Philippe 75011 Paris – France.

28.     Defendant Zenly Inc. is a Delaware corporation with a registered office care of The Company Corporation, 251 Little Falls Dr., Wilmington, DE 19808.

29.     Defendant Evan Spiegel is a natural person residing in California, maintaining an address care of Snap, 2772 Donald Douglas Loop North, Santa Monica, California 90405.

30.     Defendant Antoine Martin is a natural person residing, upon information and belief, in California.

31.     Defendant Alexis Bonillo is a natural person residing, upon information and belief, in California, and was at all relevant times a co-founder, officer and director of Zenly.

32.     Defendant Alexandre Bernard is a natural person residing, upon information and belief, in Paris, France, and was at all relevant times a co-founder, officer and director of Zenly.

33.     Defendant Nicolas Dancie is a natural person residing, upon information and belief, in Paris, France, and was at all relevant times the Chief Experience Officer of Zenly.

34.     Defendant Noe Loterman is a natural person residing, upon information and belief, in California, and was at all relevant times a member of Zenly's growth team.

35.     Defendant Nicolas Fallourd is a natural person residing, upon information and belief, in Paris, France, and was at all relevant times a member of Zenly's Senior Product Designer and Product Manager.

36.     Defendant Jonathan Etaix is a natural person residing, upon information and belief, in Paris, France, and was at all relevant times a a front-end developer for Zenly.

37.     Defendant Christophe Kerebel is a natural person residing, upon information and belief, in California, and was at all relevant times a Product Designer at Zenly.

38.     Defendant Roy Marmlestein is a natural person residing, upon information and belief, in New York, NY, and was at all relevant times an iOS Developer at Zenly.

39.     Each of the defendants were the agents, servants, employees and co-conspirators of their co-defendants, and while performing the acts hereinafter alleged, were acting within the course, scope and extent of their agency and employment, in furtherance of the alleged conspiratorial goals, and were acting with the permission, consent and ratification of their co-defendants.

## IV.

## BACKGROUND FACTS

### A.   YOUMAP AND YOUMAP'S VISION

40.     YouMap's primary line of business is to furnish YOUMAP for use by its users and the public. It was available for download on Apple Inc.'s App Store. YOUMAP (i) provides a geospatial, social map connecting users to the world around them through online social networks and (ii) enables users to share and view information describing the geographic location of various interests.

41.     It took several years for Mr. Constantinides to build YOUMAP according to his vision – but with Zenly's snap of a few computer buttons, Mr. Constantinides's hard work and Trade Secrets (defined below) were stolen by Defendants in a matter of minutes. One of his main goals for YOUMAP was to allow users to quickly ascertain (i) what was happening in a particular area and (ii) the emotive context behind what was happening, and then to provide a vast array of information not easily visualized by other social-media platforms. This is why YouMap calls YOUMAP: an "atlas" of human events.

42.     In sum, YOUMAP revolutionized the nature of the data displayed on a real-time map by creating a medium to communicate spatial data on real-time maps. In other words, YOUMAP provides users with the platform to identify the location, such as whether the user is or intends to go, and – at the same time – allows that user to see what is happening in that location—and remain connected to developments therein.

### B.   YOUMAP EXPANDS THE USE-CASE OF REAL-TIME MAPS

43.     In 2015, Mr. Constantinides wanted to build a new kind of social platform he called a "real-time social and emotional mapping system" enabling the visualization of data not

generally visualized in other social platforms. This system went beyond the state of the art at the time which did not adequately relay the semantic meaning of information at higher zoom levels, without further clicking on the information to reveal it.

44.     To do that in YOUMAP, users can join already-created communities or form user created communities to drive action on social and personal matters relevant to the user and/or the user's community, such as identifying the best local nightlife scene or providing relevant information on the scale and scope of public demonstration or protests.

45.     It also allows users to collaborate with other users to create engagement on social or public matters. YOUMAP was developed to provide users with the tools to publicize what is happening at various events. For example, if a surfer-user wants to know real-time surf conditions at a particular beach, the surfer-user would use YOUMAP to review what other surfer-users at such beach were reporting on those conditions in YOUMAP. Other use cases entail sharing real-time ratings or reviews on restaurants, coffee houses or literally any other social club. YOUMAP is intended to drive user engagement for local, regional, national and worldwide events.

C.     YOUMAP'S ADAPTIVE VISUALIZATION SYSTEM

46.     YOUMAP's novel technologies deliver content through a revolutionary visualization system that overcomes multiple practical limitations of running a social network on a small map running on a small mobile phone screen. YOUMAP had to be built, and was built, to display a vast amount of visual content on a mobile phone screen, all the while maintaining legible and relevant, semantical information at all possible zoom levels on a map.

47.     With YOUMAP, Mr. Constantinides solved the industry-wide problems of how to prevent content and information from becoming too busy and overlapping on a mobile phone

screen, how to deliver content and information in legible format, how to maintain semantic cues at high-zoom levels where mobile-phone screen space becomes less available, and how to prioritize information-order in terms of unique user relevance.

48.     For example, at the time Mr. Constantinides started to consider a solution for those issues, the predominant method of depicting consolidated content on a map was with "map markers," which are depicted by the circles with numbers in Figure 3, below. Those figures identify the number of content-events for that spatial area. To Mr. Constantinides, using already-existing technology was not an option because YOUMAP would be unable to communicate the contextual and relevant explanation of what was behind those map markers. In other words, the map marker portrayed only a content-concentration number and otherwise lacked qualitative significance:

**FIGURE 3:**



49.     This inferior method to display content concentrations was predominantly used by other social-media networks, including, upon information and belief, in the Snap Map module. As set forth below, in Figure 4, other social-media networks hid information behind the content-concentration numbers, such that the only information that was conveyed was the number of

event — but not any relevant context. So, a user had no way to determine the relevance of the content concentration, other than by clicking on the content-concentration number. For example, on Periscope, the content-concentration numbers prevented a user from understanding the semantic data underlying the content-concentration number,  as depicted in Figure 4, below:

**<u>FIGURE 4:</u>**





50.     Similarly, Foursquare used similar technology as reflected in Figure 5, below, which shows only the content-concentration of relevant businesses without revealing semantic data underlying the content concentration number:

**FIGURE 5:**



51.     So, instead of using a superficial content-concentration technology, Mr. Constantinides built a system for adaptive visualization of relevant content through intelligently-detailed previews of a subset of the total post at any given zoom or pan level. That system utilizes ephemeral "post bubbles" – a form of biomimicry of the natural physics of bubbles in nature. His vision, ultimately incorporated into YOUMAP, was for those bubbles to pop in and out adaptively as a user zooms and pans in order to preview posted, relevant content. Unlike the stale technology, YouMap's bubbles provided users with semantic information without the need for opening each individual social post.

52.     In YOUMAP, Mr. Constantinides's system prevents overlapping, crowding bubbles (which was the inferior technology used by Zenly before it stole YouMap's technologies) and displays enough bubbles only as can be comprehended intelligently on a user's screen at any given time.

53.     These bubbles may expand even further, like flags unfurling to show even fuller content if the screen space is available. They do not overlap, which is a critical feature.

YOUMAP is able to detect the available screen space and then display only content previews that the screen can handle at a given screen axis. Furthermore, the bubbles themselves can move, so if the map is panned left, the bubble may move slightly to the left beforehand.

54.     A second important part of YouMap's system is density aggregation technology. Without density visualization acting as a guide, the user would not know where more content would be visually displayed. So, it is in combination that the post bubbles and heat maps gain their power to provide a user experience that was not in existence before YOUMAP. This is important, not because YouMap invented heat maps, but because YOUMAP combined and integrated the functionality of the density visualization and the adaptive bubbles: the first providing the guide to browse content, and the second intelligently displaying that content so the user did not have to click again to understand whether the content is relevant. Figure 6, below, shows YOUMAP:

**FIGURE 6:**

## YouMap - Real time sharing



55.     Figure 7, below, identifies the technology misappropriated by the Defendants and then incorporated into SNAPCHAT. For the avoidance of any doubt, SNAPCHAT did not have a mapping feature until the Zenly/Snap Deal. Yet, right out the gate, SNAPCHAT used the form of density visualization developed by YouMap to guide users to where more " post bubbles" may be located. Both then display more semantic information without clicking further to display information therein, using zoom itself as a tool for providing more information:

**FIGURE 7:**

**YOUMAP**                              **SNAPCHAT**



**D.     YOUMAP'S RANKING AND RELEVANCY SYSTEM**

56.     Next, YouMap revolutionized a solution to another issue: how to provide relevant content even more digestible on the limited space of a mobile phone screen.

57.     While various social media platforms may provide users with trending topics (e.g., Reddit, Facebook, Twitter), YouMap's technology focuses on how a social media platform can communicate and operate relevant information on a real-time map. To contrast, other social-media platforms utilize an initial page that displays trending posts or posts that generate a higher relevance value than other posts. YOUMAP's technology, on the other hand, functionally displays relevant content or content that may otherwise have a higher value than other posts depending on the user's zooming or panning activity, such that YOUMAP may intelligently display content having higher micro-relevance than lower macro-relevance as the user zooms or pans into geospatial regions on the map.

58.     Whereas other social-media platforms' algorithm solution is fairly simple: rank content based on predefined relevance levels, such as on upvotes or time, and then list the highest-ranking relevance post in first position with less relevant content following thereafter. YouMap's technology does not randomly display bubbles simply due to zooming or panning activity on the map. In contrast, YouMap attaches the zoom level at which the bubbles appear through a passive retrieval method dependent on both macro- and micro-relevance analysis.

59.     Additionally, Mr. Constantinides changed the way maps were to be used on social-media networks. Historically, a map functioned as an identifier of location. YouMap expands the use-case by showing users what is happening – in real time – in a particular location, as depicted in Figure 8, below:

**FIGURE 8:**



### E.   YOUMAP'S DEVELOPMENT

60.    YOUMAP was developed by YouMap with internal and external software, technology and infrastructure developers over the last several years. Those professionals were subject to confidential, non-disclosure and non-use obligations with respect to YouMap's non-public, proprietary and confidential intellectual property and trade secrets. Upon the development of any intellectual property, those professionals assigned sufficient right, title or interest to YouMap.

61.    Some of the technology used in YOUMAP, such as the map underlayment, is pulled by application programming interfaces ("**API**") from technology services or libraries of other providers.

62.    YouMap connects its Mobile App to the mapping libraries of MapBox, Inc. ("**MapBox**") through an API. In general, MapBox offers mapping and located-based solutions for development and mobile applications. YouMap has a license from MapBox to use its mapping technology in YOUMAP (the "**map underlayment**").

63.    YouMap connects to MapBox's mapping libraries so that it would not have had to incur the additional time and expense of independently developing a separate mapping technology or otherwise independently granularly mapping the world.

64.     YOUMAP's user-interface (the "**UI**") is built on the map underlayment. *See e.g.,* Exhibit 1. The map underlayment displays information traditionally seen on maps, such as streets and towns. It also identifies businesses, vendors and other landmarks, such as restaurants, coffeehouses, bars, events, attractions, hotels, parks, museums and theatres. The map underlayment is owned by, upon information or belief, MapBox or its licensors; it is not owned by YouMap.

65.     The UI is critical to create an immersive user and location-based experience. A competitive advantage of YOUMAP is the capability to create sub-environment or sub-communities on the UI.

66.     For example, if a group of friends attends an event at a neighborhood social club, they could create on the map underlayment a sub-community for that club identifying whether the club's scene is trendy enough for others to attend. In its narrowest sense, the UI allows users to provide real-time micro reviews or information about a particular experience at a certain geographic location. The UI's real-time micro-review functionality harnesses and facilitates user interaction on daily basis. As user engagement grows, YOUMAP becomes the go-to source for real-time information on user-created environments and communities, along with more public environments and communities, such as political demonstrations and protests.

67.     The UI allows a user to create environment and communities visually displayed on the UI using, what YouMap calls, MapMojis ("**MapMoji**"). A MapMoji is an icon layer symbolizing an environment, community or mood on the UI further functionalized through a corresponding text box allowing a user to describe the environment, community or mood.

68.     For example, the following screenshot in Figure 9 features a MapMoji, which is depicted through the combination of the icon of the swimmer communicating in a chat box a "Swimming          Spot!"          for          other          users          to          explore:

**FIGURE 9:**



69.     YOUMAP offers many MapMojis for its users to contextually and symbolically communicate subjective, emotive and semantic information over a map interface.

**F.     BETA TESTING**

70.     In the summer of 2016, YouMap initiated the Beta Testing of YOUMAP. The Beta Testing was hosted through Apple's beta testing tool "TestFlight", through which a beta version of YOUMAP was available for download and use by participants who accepted the terms and conditions of the Beta Testing. Among those terms and conditions, each participant, including the Defendant-participants, promised to maintain the confidentiality, not use for any purpose other than Beta Testing and not disclose any of YouMap's confidential or proprietary information, which included information about YOUMAP (the "**Agreement**").

71.     Additionally, under the Agreement, those participants were granted "a limited, non-exclusive, non-assignable, non-sublicensable license to access, download and use [YOUMAP] for which you have been selected as a beta-tester and any related documentation available online, solely for beta-testing purposes for a limited time and subject to these [terms and conditions]."

72.     Critically, as between the participant in the Beta Testing and YouMap, the participant agreed that YouMap "owns all right, title and interest in the Beta App, including but not limited to intellectual property rights."

73.     They also agreed to not: "(a) modify, reverse engineer, decompile, or disassemble [YOUMAP]; (b) rent, lease, loan, sell, sublicense, distribute, transmit, or otherwise transfer [YOUMAP]; (c) make any copy of or otherwise reproduce [YOUMAP]; or (d) display [YOUMAP] to unauthorized third parties without the [YouMap's] authorization."

74.     Once in the Beta Testing, Zenly caused its representatives to steal YouMaps's non-public, proprietary and confidential intellectual property and trade secrets. Not only did Zenly steal it, but Zenly then incorporated such property and trade secrets into ZENLY's then-latest iteration released in or about March 2017 — shortly after Zenly and its representatives infiltrated the Beta Testing.

75.     YouMap offered access to the Beta Testing by invitation only, meaning access to the Beta Testing could occur only after YouMap's service provider either invited a participant or the participant's request to participate was accepted by YouMap's service provider.

76.     Zenly made a concerted effort to gain access to the Beta Testing in late 2016 for the purpose of learning about YouMaps's non-public, proprietary and confidential intellectual property and trade secrets, including YOUMAP.

77.     Defendant Dancie was accepted into the Beta Testing on February 1, 2017.

78.     Defendant Loterman was accepted into the Beta Testing on February 1, 2017 and registered therefor using a first name of "Nolowter" and a last name of "Nolowter." He did not use his Zenly email address or his legal name because he did not want to identify as a Zenly employee.

79.     Defendant Fallourd was accepted into the Beta Testing on February 1, 2017 and registered therefor using what appears to be his legal name, Nicolas Fallourd. Yet, he did not list his Zenly email address during the registration process because he did not want to identify as a Zenly employee. As late as December 10, 2016, Defendant Fallourd publicly posted on social media as set forth in Figure 10 a photo of a Christmas tree ornament that was Snap's SNAPCHAT ghost logo with various hashtags. This picture evidences Zenly's and Snap's working together to misappropriate YouMap's technologies.

**FIGURE 10:**



80.     Defendant Etaix was accepted into the Beta Testing on November 29, 2016 listing an email address other than his Zenly email address and then again on January 10, 2017 listing another email address other than his Zenly email address. He did not list his Zenly email address

during the registration process because he did not want to identify as a Zenly employee. Defendant Etaix installed version 0.5 of YOUMAP on February 1, 2017 and, thereafter, upon information and belief, shared the downloaded material with the other Defendants, each of whom used and stole YouMap's technology and breached the Agreement.

81.     Defendant Kerebel was accepted into the Beta Testing on February 1, 2017 and registered therefor using a first name of "Christophe" and a last name of "Christophe." He did not list his Zenly email address or his legal name during the registration process because he did not want to identify as a Zenly employee.

82.     Defendant Marmelstein was accepted into the Beta Testing on February 1, 2017. He did not list his Zenly email address during the registration process because he did not want to identify as a Zenly employee.

83.     Defendants Marmelstein, Kerebel, Etaix, Dancie, Loterman and Fallourd sought to, did participate and/or downloaded a beta version of YOUMAP at the direction and instruction of the other Defendants, who, at all relevant times, controlled and directed them and each other to engage in the actions and inactions alleged in this Complaint. Despite participating in the Beta testing, none of the Defendants furnished any comments to YouMap with respect to YOUMAP, thereby evidencing they were participating in the Beta Testing for nefarious reasons.

G.     YOUMAP'S TRADE SECRETS

84.     Once in the Beta Testing, and with access to YOUMAP, the Defendants misappropriated the non-public, proprietary and confidential intellectual property and trade secrets in and of YOUMAP (the "**Trade Secrets**") and breached the Agreement, in which YouMap has invested extensive time, effort, money and creativity in building, creating and developing, including but not limited to the following:

a.      The technology to automatically update users status to change symbolization representations of user actions by analyzing patterns in sensor data.

b.      The technology to rank stories on the map.

c.      The technology to visualize stories on a map.

d.      The technology to animate stories on a map.

e.      The technology to analyze social cues and display those cues as aggregated social patterns.

f.      Geomarketing and promotion methodologies.

g.      Business and strategic plans, marketing channels and customer segments.

85.      YouMap is the sole owner and proprietor of all right, title and interest in and to the Trade Secrets. In reliance on the Defendants' confidential, non-disclosure and non-use promises as a condition to participation in the Beta Testing, YouMap disclosed the Trade Secrets to the Defendants. YouMap takes responsible steps to safeguard the Trade Secrets. YouMap stores them in a secure location and limits access only to individuals having a need to know the Trade Secrets or otherwise promising to maintain confidences, not disclose them and not use them other than the purpose for which disclosure is made, such as in the Beta Testing. YouMap would not have disclosed the Trade Secrets to Defendants but for their promises and representations.

86.      YouMap implemented protective measures to prevent Trade Secrets from unauthorized use, so that others cannot unjustifiably reap the benefits of YouMap's extensive investment in labor and innovation of the Trade Secrets. Prior to YouMap's disclosure of the Trade Secrets to Defendants, they had no knowledge of and did not use any of YouMap's Trade Secrets.

87.    The Trade Secrets have independent economic value from not being generally known to, and not readily ascertainable through proper means, by another person. The Trade Secrets are crucial to business growth, efficiency, profit generation, increased market shares, increased customer interaction, goodwill creation and growth, increased technological efficiencies, cost savings and other increased customer interaction and revenue.

**H.    BEFORE THE BETA TESTING, NEITHER SNAP NOR ZENLY USED YOUMAP'S TRADE SECRETS**

88.    Before their participation in the Beta Testing, neither ZENLY nor Snap used any of Trade Secrets.

89.    After misappropriating the Trade Secrets, Zenly and the Zenly-related defendants, Defendants Bonillo, Bernard, Marmelstein, Kerebel, Etaix, Dancie, Loterman and Fallourd, used and incorporated the Trade Secrets into ZENLY. Figure 11, below, confirms that ZENLY's technology (before it stole YouMap's technologies) contains significant content overlap and crowding on its map visualizations, such that it is not scalable to a large number of posts or user avatars:

**FIGURE 11:**



90.     Had Zenly approached Snap with this iteration of technology to purchase, Snap would not have purchased Zenly's intellectual property, including ZENLY. That's because ZENLY was only a people-finder and that is what Zenly had focused its development and marketing. ZENLY did not have any technology for Snap's intended use in SNAPCHAT, namely to geographically map semantic information for its users. Additionally, and for the sake of clarity, prior to the Zenly/Snap Deal, Snap did not have a mapping platform in or for SNAPCHAT. What SNAPCHAT needed, however, was YOUMAP's technology, as YOUMAP had both the people-finder technology of ZENLY and the functionality to display semantic information on a map (a technology both ZENLY and SNAPCHAT were lacking). Neither Zenly nor Snap could have developed the functionality each was lacking in ZENLY and SNAPCHAT, respectively, between the period of February 1, 2017 up to and through the date of SNAPCHAT's public release of its Snap Map component.

91.     In the Zenly/Snap Deal, Zenly sold ZENLY to Snap, but Zenly did not have rights in  the Trade Secrets to sell them to Snap. Snap knew that, too, as it was complicit in misappropriating the Trade Secrets. Yet, Snap incorporated the Trade Secrets into SNAPCHAT, substituting the Trade Secrets for the Snap Map technology developed internally by Snap.

92.     Looking and acting nothing like YOUMAP before the Zenly/Snap Deal, SNAPCHAT looks and acts like YOUMAP after the Zenly/Snap Deal, as depicted in Figure 12, below, confirming that Defendants had misappropriated the Trade Secrets, Zenly purpoted to sell them    to    Snap,    and    then    Snap    incorporated    them    into    SNAPCHAT.

**FIGURE 12:**

**YOUMAP**                                    **SNAPCHAT**



93.     SNAPCHAT contains the misappropriated Trade Secrets, such as YouMap's visualization system and density aggregation tools guiding the user during browsing, allowing the user to key in on where the post exists through the ephemeral bubble-like post previews which intelligently adapt to a user's screen space and axis.

94. Next, Figure 13, below, compares the post overlay on YOUMAP and SNAPCHAT, which adapts to screen space, sometimes extending a flag with more information based on available screen space:

**FIGURE 13:**

**YOUMAP**                                        **SNAPCHAT**



95. After YouMap publicly released YOUMAP in July 2017 into a market in which Snap had already incorporated the Trade Secrets into SNAP after having purportedly acquired in the Zenly/Snap Deal, various market participants and users commented on the confusion and the

substantial similarities of the mobile applications. But the market was not commenting entirely on the similarities or confusion between YOUMAP and SNAPCHAT. Instead, they were primarily talking about how SNAPCHAT copied ZENLY.

96.     What makes matters worse, however, is that Snap and Zenly communicated to the market that each of them were responsible for the development of the stolen Trade Secrets incorporated into their respective products. As a direct and proximate cause of the foregoing, the market and users are confused about the developer and source of the development and ownership of the Trade Secrets.

97.     But, it was not just pundits and critics positing that Snap could not have developed this technology in the rushed time period between acquisition and release, or that the Zenly/Snap Deal did not make any sense for Snap since Snap was buying technology from Zenly that the public knew from their use of ZENLY was only to find people, not display semantic information on a map. Even Snap's own employees questioned the Zenly/Snap Deal. That's because in the summer of 2016, a team of Snap engineers begin building a feature for SNAPCHAT known as Snap Map, which would display people's locations and publicly posted stories on a map and would have been a competitor to both Zenly and YouMap. Because SNAPCHAT did not have a mapping feature, it had to either internally develop one or purchase the technology. Zenly and Snap could not have independently developed the technology for the Trade Secrets in the period of time between when Defendants misappropriated them from YouMap and the release of their respecdtive mobile applications. So, Snap did the latter, and incorporated the Trade Secrets into SNAPCHAT, as depicted in Figure 14:

**FIGURE 14:**



98.   Then, one month before Snap was scheduled to release Snap Map in June 2017, the Zenly/Snap Deal closed and Snap's internally developed Snap Map was not used. Instead, Snap used the stolen Trade Secrets in SNAPCHAT. Snap's employees were confused and surprised by the Zenly/Snap Deal, particularly with the speed by which the Trade Secrets were incorporated into SNAPCHAT and with Snap's rush to market therewith.

## I.   SNAP ACQUIRES ZENLY

99.   With Zenly's unlawful incorporation of the Trade Secrets into ZENLY, Zenly and the Zenly-related Defendants had completed their part of the plan. Benchmark Capital, Mr. Fenton and Mr. Lasky had completed their part of the plan by convincing their respective colleagues on the board of directors of Snap and Zenly to approve the Zenly/Snap Deal. Thus, as

a direct and proximate result of the misappropriation of YouMap's Trade Secrets, Snap acquired Zenly in May 2017.

100.    Snap described Zenly as a company that develops a location-based social media application that allows users to see where their friends are on a map. Snap's stated purpose for the acquisition was to enhance the functionality of SNAPCHAT. Snap's stated purpose is false and misleading, as Snap had already completed internal development of Snap Map and, according to reports from various employees, Zenly's technology before Zenly's misappropriation of the Trade Secrets was not necessary.

101.    The total consideration paid by Snap in the Zenly/Snap Deal was $213.3 million in cash, of which $196.1 million represented purchase consideration and included $186.8 million in cash paid to the sellers of Zenly and $9.3 million of liabilities due to the sellers of Zenly. The remaining $17.2 million of total consideration transferred represents compensation for future employment services. The allocation of that purchase price was preliminary and was subject to additional information related to the liabilities that existed as of the acquisition date. The preliminary allocation of the total purchase consideration for the Zenly/Snap Deal was estimated as follows:

| | Total (in thousands) | |
|---|---|---|
| Cash | $ | 22,610 |
| Technology | $ | 23,000 |
| Goodwill | $ | 154,353 |
| Net deferred tax liability | $ | (2,418) |
| Other assets acquired and liabilities assumed, net | $ | (1,428 |
| Total | $ | **196,117** |

102.    Since the Trade Secrets were stolen, Zenly did not have sufficient rights to assign or transfer any right, title or interest in or to the Trade Secrets and, by extension, Snap never

acquired any right, title or interest in or to the Trade Secrets purportedly acquired from or in Zenly

103.    As a direct and proximate cause of Defendants' unlawful conduct, YouMap has suffered and continues to suffer substantial damages.

## V.

## CLAIMS FOR RELIEF

### COUNT I
### (VIOLATION OF THE DEFEND TRADE SECRETS ACT (18 U.S.C. § 1836))

104.    Plaintiff incorporates paragraphs 1 through 103 of this complaint as if fully set forth herein.

105.    Defendants' conduct constitutes a violation of The Defend Trade Secrets Act, 18 U.S.C. § 1836.

106.    Plaintiff is the owner of the Trade Secrets, which are related to services used or intended for use in interstate or foreign commerce.

107.    Plaintiff disclosed the Trade Secrets subject to confidentiality, non-use, and nondisclosure restrictions in the Agreement.

108.    Defendants misappropriated the Trade Secrets by knowingly acquiring the Trade Secrets through improper means, namely, by making false statements and promises and otherwise fraudulently inducing the Plaintiff to disclose the Trade Secrets.

109.    Defendants further misappropriated the Trade Secrets by using the Trade Secrets without Plaintiff's express or implied consent.

110.    The Trade Secrets are not known to the public and are not readily ascertainable by proper means to persons who could derive value from their disclosure or use.

111.    Plaintiff has taken reasonable steps to maintain the secrecy of his Trade Secrets.

112.    The Trade Secrets have substantial economic value and have conferred a competitive advantage to the defendants.

113.    Defendants have and will continue to recklessly and maliciously misappropriate and use the Trade Secrets.

114.    As a direct and proximate cause of defendants' current and continued misappropriation of the Trade Secrets, Plaintiff will suffer imminent and irreparable harm and, alternatively, has suffered substantial damages.

115.    Plaintiff has no adequate remedy at law. Unless enjoined by this Court, defendants' acts of misappropriation will continue and Plaintiff will continue to suffer irreparable harm.

## COUNT II
## (COMMON LAW MISAPPROPRIATION OF TRADE SECRETS)

116.    Plaintiff incorporates paragraphs 1 through 115 of this complaint as if fully set forth herein.

117.    As a direct and proximate cause of defendants' current and continued willful and malicious misappropriation of the Trade Secrets, Plaintiff will suffer imminent and irreparable harm and, alternatively, has suffered substantial damages.

118.    Plaintiff has no adequate remedy at law. Unless enjoined by this Court, defendants' acts of misappropriation will continue and Plaintiff will continue to suffer irreparable harm.

## COUNT III
## (UNFAIR COMPETITION)

119.    Plaintiff incorporates paragraphs 1 through 118 of this complaint as if fully set forth herein.

120.     Plaintiff had a reasonable expectancy of entering into a valid business relationship with users of YOUMAP.

121.     Defendants interfered with such relationships and expectations, which were defeated by Defendants' wrongful conduct.

122.     Defendants fraudulently sought to offer and sell ZENLY and SNAP to their users for those YOUMAP.

123.     Defendants' acts were reasonably calculated to deceive the average user under the ordinary conditions prevailing in the particular trade.

124.     Defendants engaged in unfair, immoral, unethical, deceptive and unscrupulous action that resulted in preventing Plaintiff from legitimately earning revenue.

125.     As a direct and proximate cause of the foregoing, Plaintiff has suffered and continues to suffer and incur substantial damages.

## COUNT IV
## (BREACH OF CONTRACT)

126.     Plaintiff incorporates paragraphs 1 through 125 of this complaint as if fully set forth herein.

127.     Zenly, Snap and the individual participants in the Beta Testing entered into the Agreement with sufficient consideration.

128.     They breached the Agreement.

129.     As a direct and proximate cause of the foregoing, Plaintiff has suffered and continues to suffer and incur substantial damages.

## COUNT V
## (UNJUST ENRICHMENT)

130.    Plaintiff incorporates paragraphs 1 through 129 of this complaint as if fully set forth herein.

131.    Defendants have been enriched and benefited from their use of Plaintiff's confidential and proprietary information and the Trade Secrets including, for illustrative purposes only, by accelerating the development of Defendants' businesses.

132.    Defendants have been enriched at Plaintiff's expense, as Plaintiff has devoted substantial amounts of time, effort, money, talent, and creativity to the development of its property, including its confidential and proprietary information and Trade Secrets.

133.    Given Defendants' inequitable misconduct, including their intentional and knowing misappropriation of Plaintiff's property and confidential information, including the Trade Secrets, for the purpose of exploiting and utilizing the Trade Secrets for Defendants' own financial benefit, equity and good conscience require restitution

134.    As a direct and proximate cause of the foregoing, Plaintiff has suffered and continues to suffer and incur substantial damages.

**COUNT VI**
**(VIOLATION OF CALIFORNIA BUSINESS & PROFESSIONS CODE §17200)**

135.    Plaintiff incorporates paragraphs 1 through 135 of this complaint as if fully set forth herein.

136.    Defendants violated federal law and state statutory and common law, including, without limitation, by engaging in unlawful, unfair and/or fraudulent business acts or practices and in unfair, deceptive, untrue or misleading advertising.

137.    Users of SNAPCHAT, ZENLY and YOUMAP were deceived, or are likely to be deceived, by Defendants' unlawful conduct.

138.     As a direct and proximate cause of the foregoing, Plaintiff has suffered and continues to suffer and incur substantial damages.

## COUNT VII
## (VIOLATION OF DELAWARE UNIFORM DECEPTIVE TRADE PRACTICES ACT)

139.     Plaintiff incorporates paragraphs 1 through 138 of this complaint as if fully set forth herein.

140.     Defendants willfully engaged in deceptive trade practices, including under 6 Del. C. § 2531 *et seq.*, in the course of their respective businesses, vocations and occupations by:

  a.     Passing off YouMap's property as their own;

  b.     Causing a likelihood of confusion or of misunderstanding as to the source, sponsorship, approval, or certification of their goods or services, including their respective mobile applications;

  c.     Causing likelihood of confusion or of misunderstanding as to affiliation, connection, or association with, or certification by, YouMap;

  d.     Using deceptive representations or designations of geographic origin in connection with their goods or services, including their respective mobile applications;

  e.     Representing that their goods or services, including their respective mobile applications, have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have, or that they have a sponsorship, approval, status, affiliation, or connection with YouMap that they do not have;

  f.     Representing that their goods, including their respective mobile applications, are original or new if they are deteriorated, altered, reconditioned, reclaimed, used, or secondhand;

g.      Representing that their goods or services, including their respective mobile applications, are of a particular standard, quality, or grade, or that goods are of a particular style or model, when they are, in fact, of another;

h.      Disparaging the goods, services, or business of YouMap by false or misleading representation of fact;

i.      Advertising goods or services, including their respective mobile applications, with intent not to sell them as advertised;

j.      Engaging in other conduct which similarly creates a likelihood of confusion or of misunderstanding with respect to YouMap and YOUMAP;

k.      engaging in any activity constituting unfair competition, with YouMap's rights, or to use, or to exploit the same; and

l.      assisting, aiding or abetting another person or business entity in engaging or performing any of the activities enumerated in the preceding sub-paragraphs, above.

141.   As a direct and proximate cause of the foregoing exception case, Plaintiff has suffered and continues to suffer and incur substantial damages.

## COUNT VIII
### (TORTIOUS INTERFERENCE WITH BUSINESS RELATIONSHIPS AND PROSPECTS)

142.   Plaintiff incorporates paragraphs 1 through 141 of this complaint as if fully set forth herein.

143.   YouMap had a reasonable probability of a business opportunity with users of ZENLY and SNAPCHAT.

144.   Defendants intentionally and wrongfully interfered with YouMap's business opportunities with those users, of which the Defendants had a knowledge and awareness.

145.    Defendants induced or caused those users to not enter into a business relationship with YouMap and/or to breach an existing business relationship with YouMap.

146.    As a direct and proximate cause of the foregoing, Plaintiff has suffered and continues to suffer and incur substantial damages.

## COUNT IX
## (VIOLATION OF LANHAM ACT)

147.    Plaintiff incorporates paragraphs 1 through 146 of this complaint as if fully set forth herein.

148.    Defendants' unauthorized use of the Trade Secrets and their statements about their respective mobile applications, including their development and source, were false or misleading to consumers and likely to deceiver consumers.

149.    The statement had a tendency to deceive or actually deceive a substantial segment of consumer into believing the Defendants' respective mobile applications were developed by the respective Defendants and without reference or misappropriate of the Trade Secrets.

150.    Defendants engaged in unfair treatment of the Plaintiff on the sole or primary basis of an anti-competitive motive.

151.    Plaintiff has suffered actual damages proximately caused by Defendants' violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

152.    As a direct and proximate cause of the foregoing, Plaintiff has suffered and continues to suffer and incur substantial damages.

**WHEREFORE**, Plaintiff You Map Inc. demands entry of judgment against the defendants as follows:

1.      Temporarily, preliminarily, and permanently enjoining each of the Defendants and their respective employees, agents, officers, directors, attorneys, successors, affiliates, subsidiaries and assigns, and all those in active concert and participation with each of them from:

a.      Passing off YouMap's property as their own;

b.      Causing a likelihood of confusion or of misunderstanding as to the source, sponsorship, approval, or certification of their goods or services, including their respective mobile applications;

c.      Causing likelihood of confusion or of misunderstanding as to affiliation, connection, or association with, or certification by, YouMap;

d.      Using deceptive representations or designations of geographic origin in connection with their goods or services, including their respective mobile applications;

e.      Representing that their goods or services, including their respective mobile applications, have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have, or that they have a sponsorship, approval, status, affiliation, or connection with YouMap that they do not have;

f.      Representing that their goods, including their respective mobile applications, are original or new if they are deteriorated, altered, reconditioned, reclaimed, used, or secondhand;

g.      Representing that their goods or services, including their respective mobile applications, are of a particular standard, quality, or grade, or that goods are of a particular style or model, when they are, in fact, of another;

h.      Disparaging the goods, services, or business of YouMap by false or misleading representation of fact;

i.      Advertising goods or services, including their respective mobile applications, with intent not to sell them as advertised;

j.      Engaging in other conduct which similarly creates a likelihood of confusion or of misunderstanding with respect to YouMap and YOUMAP;

Case 1:20-cv-00162-UNA   Document 1   Filed 01/31/20   Page 44 of 45 PageID #: 44

k.      engaging in any activity constituting unfair competition, with YouMap's rights, or to use, or to exploit the same; and

l.      assisting, aiding or abetting another person or business entity in engaging or performing any of the activities enumerated in the preceding sub-paragraphs, above.

2.      Finding that Defendants have engaged in unfair competition in violation of the Lanham Act;

3.      Finding that Defendants have engaged in unfair competition in violation of Delaware common law and Delaware's Uniform Deceptive Trade Practices Act;

4.      Finding that Defendants have violated Delaware common law;

5.      Finding that Defendants have engaged in violation of California Business & Professions Code §17200;

6.      Finding that Defendants have engaged in unfair competition in violation of The Defend Trade Secrets Act;

7.      Finding that Defendants are liable to Plaintiff on all counts of the complaint;

8.      Awarding to YouMap its actual loss; damages; reliance damages; incidental damages; consequential damages; punitive damages; treble damages under 6 Del. C. § 2533; an accounting; unjust enrichment under 18 U.S.C. § 1836(3)(B)(II); restitution; Defendants' profits; the reasonable value of goods and services; specific performance; equitable relief; attorneys' fees, including under 15 U.S.C. § 1117, 18 U.S.C. § 1836(3)(D), 6 Del. C. § 2533; exemplary damages under 18 U.S.C. § 1836(3)(C); a reasonable royalty under 18 U.S.C. § 1836(3)(B); constructive trust; prejudgment interest; post judgment interest; costs; and such other and further relief as the court deems just and proper.

# VI.

## DEMAND FOR A JURY TRIAL

Plaintiff You Map Inc. hereby demands a jury trial on all issues triable by a jury.

Dated: January 31, 2020                    Respectfully submitted,


**STAMOULIS & WEINBLATT LLC**

/s/ Stamatios Stamoulis
Stamatios Stamoulis
   stamoulis@swdelaw.com
Richard C. Weinblatt
   weinblatt@swdelaw.com
800 N. West Street, Third Floor
Wilmington, DE 19801
(302) 999-1540

**GORA LLC**

Richard Gora*
   rich@goralaw.com
   (203) 424-8021
Sinead Rafferty*
   sinead@goralaw.com
   (646) 298-8523
2 Corporate Dr., Suite 210
Trumbull, CT 06611
*Pro Hac Vice Forthcoming*


**ATTORNEYS FOR THE PLAINTIFF
YOU MAP INC.**