## THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| YOU MAP, INC.,<br><br>    Plaintiff,<br><br>v.<br><br>SNAP INC., ZENLY S.A.S., ZENLY INC.,<br>EVAN SPIEGEL, ANTOINE MARTIN,<br>ALEXIS BONILLO, ALEXANDRE<br>BERNARD, NICOLAS DANCIE, NOE<br>LOTERMAN, NICOLAS FALLOURD,<br>JONATHAN ETAIX, CHRISTOPHE<br>KEREBEL and ROY MARMLESTEIN,<br><br>    Defendants. | Civil Action No.: 20-00162-CFC<br><br><br>**FIRST AMENDED COMPLAINT** |

### FIRST AMENDED COMPLAINT

Plaintiff, You Map, Inc. ("**Plaintiff**" or "**YouMap**"), by and through its undersigned counsel, hereby complains of defendants Snap Inc. ("**Snap**"), Zenly SAS, Zenly Inc. (together with Zenly S.A.S., "**Zenly**")[1], Nicolas Dancie, Noe Loterman, Nicolas Fallourd, Jonathan Etaix, Christophe Kerebel and Roy Marmlestein[2] (collectively, Snap, Zenly and the Individual Defendants are referred to as the "**Defendants**"), as follows:

### PRELIMINARY STATEMENT

1.    YouMap's founder, Stephen Constantinides, invested a significant amount of capital into YouMap over several years to create significant novel, cutting-edge, real-time

---

[1] Zenly SAS and Zenly, Inc. are collectively referred to as "Zenly" in this First Amended Complaint. Upon information and belief, both Zenly entities acted collectively and in concert as asserted in the allegations herein through their agents and representatives, including the Individual Defendants, defined below.  With further discovery in this matter, Plaintiff anticipates it may be able to further differentiate various actions between and by the two Zenly entities, particularly before Zenly Inc. was dissolved on May 22, 2017.

[2] Defendants Nicolas Dancie, Noe Loterman, Nicolas Fallourd, Jonathan Etaix, Christophe Kerebel and Roy Marmlestein, each referred to in this First Amended Complaint as an "Individual Defendant" and collectively as "**Individual Defendants**."

location-based social media and mapping software technology that he incorporated and embedded within a unique, revolutionary mobile software developed and owned by YouMap known as YOUMAP, which is the holder of various registered trademarks for YOUMAP (Registration Nos. 5414719, 5704537, 5559445, 1402602) covering online social networking services and downloadable and non-downloadable software applications to share and view information describing geographic locations and interacting with other users ("**YOUMAP®**" or the "**YOUMAP® App**").  At all times relevant to the causes of action set forth in this First Amended Complaint, Mr. Constantinides, individually, and by and through his company, YouMap, maintained and protected that software technology as proprietary trade secrets (collectively, the trade secret software technology the subject of this action is referred to, described, and identified in this First Amended Complaint as the "**Trade Secrets**," the "**Trade Secret Technology**," or simply, the "**Technology" or "Technologies**" as those terms are used interchangeably herein).

2.     While YouMap was refining those Trade Secrets in late 2016 in advance of YOUMAP®'s public release in July 2017, Snap and Zenly, along with the Individual Defendants, colluded to steal, and then eventually stole, YouMap's Trade Secrets.  YouMap's Trade Secrets comprised various technologies, as described further herein, that Snap and Zenly were both then missing from each's respective social media and mapping applications, namely, "SNAPCHAT" and "ZENLY."

3.     After stealing YouMap's Trade Secrets, Snap and Zenly incorporated the stolen Trade Secret Technologies into their respective applications.  Thereafter, upon learning that YouMap was set to release YOUMAP® into the market from YouMap's social media releases and other publicity, Snap and Zenly each rushed their social media mapping products into the

market, beating YouMap's release of YOUMAP® by several days.  With that, Snap and Zenly obtained a tremendous head start over YouMap, damaging YouMap in the process, and otherwise gaining an unfair market share, steering public sentiment in their favor on YouMap's vision and software technology, and misappropriating YouMap's goodwill and critical acclaim by communicating to the consumer and commercial market that Snap and Zenly had developed the very technologies that were comprised of the stolen Trade Secrets.

4.      Previously, in or about 2011, Zenly had begun development of Alert.Us, a mobile software application geared for parents to track their "loved ones" whereabouts.

5.      Zenly eventually released its "Alert.Us" app in or about 2012.  It was an abysmal failure.  After recognizing that Alert.Us would never achieve commercial success, Zenly returned to the drawing board in an attempt to develop a new software application.  Having realized its strategy of marketing to parents a software technology to geographically locate their children was failing, in June 2014, Zenly rebranded the Alert.Us app into "ZENLY" and then started an advertising campaign under its new moniker with a goal of organically growing its user base.

6.      Despite the overhaul, at its core, ZENLY remained a mobile software application simply directed towards locating people and lacked any functionality to display semantic information and visualize data about what's happening in the world.

7.      Still unhappy with its growth in 2014 and 2015, Zenly decided it needed more capital for its operations.  In furtherance of that objective, Zenly raised – in just 28 days ending in September 2016 – $25,500,000, a majority of which was provided by Benchmark Capital.  The infusion of cash in 2016 was in addition to the $11,200,000 raised by Zenly in 2015.

8.      Although the more the $36,700,000 of investment was important to Zenly, more

precious to Zenly's future was Benchmark Capital's relationship with Snap.  By the time Benchmark Capital invested in Zenly, Snap had been internally developing a module for its SNAPCHAT mobile software application called "Snap Map" ("**SNAP MAP**").

9.    Unfortunately for Snap, however, SNAP MAP had not been developed to Snap's satisfaction, so Snap began investigating the market to purchase the software and technology its own developers were unable to perfect.

10.   During the relevant period, Benchmark Capital was a significant shareholder of Zenly *and* Snap. In fact, a representative of Benchmark Capital introduced Defendant Antoine Martin to Snap's Chief Executive Officer, Evan Spiegel, on a weekend trip to Aspen, Colorado in 2016, and the two founders became friends. In addition to the $22,500,000 invested in Zenly, Benchmark Capital purchased more than 120 million shares of Snap's stock.  For context, Benchmark Capital's stockholdings in Snap were valued at over $2,900,000,000, based on Snap's March 2, 2017 opening market price in its initial public offering on the New York Stock Exchange.

11.   As one of Snap's largest investors, Benchmark Capital had the right to and did elect a director to Snap's board of directors each year from 2012 up through 2018.  That designee was Mitch Lasky, who served thereon during that period.

12.   Overlapping Benchmark Capital's right to appoint at least one Snap director was Benchmark Capital's right to appoint at least one director to Zenly's board of directors.  In or about September 2016, Benchmark Capital did elect one of its partners, Peter Fenton, to Zenly's board of directors, who held such directorship until, upon information and belief, Snap's acquisition of Zenly in spring of 2017.

13.   To be clear, Mr. Fenton and Mr. Lasky, long-standing partners, colleagues, and

friends at Benchmark Capital, were respectively sitting at the same time on the boards of Zenly and Snap. Because of their relationship, Mr. Fenton and Mr. Lasky shared information between themselves about the technology at Zenly and Snap, including their respective mobile software applications.

14.   Recognizing the value of Benchmark Capital's incestuous relationship with Snap and Zenly, Mr. Fenton said, in September 2016, "Being able to see where your friends are and who they are with opens up a world of product opportunities, which if executed successfully will lead to one of the iconic companies of our lifetime."  With that quote, Mr. Fenton was mapping out Benchmark Capital's strategy to cause Zenly and Snap to enter into a purchase and sale transaction so that Benchmark Capital could garner an accretive return on its investment.   In other words, in or around September 2016, Benchmark Capital's representatives, Mr. Fenton and Mr. Lasky, were conspiring with Snap and Zenly, and their respective representatives, which includes the Individual Defendants, to broker a deal between Snap and Zenly.  If successfully brokered (which it was), Benchmark Capital would reap hundreds of millions, if not billions, of dollars in return on its investment.

15.   Mr. Fenton had a more difficult job, though.  He had to ensure Zenly's intellectual property, which included ZENLY, was sufficiently valuable to and compatible with Snap's SNAPCHAT.   That was because Snap was conducting its initial public offering within six months of Benchmark Capital's investment in Zenly, and Mr. Fenton knew Benchmark Capital had more risk (and a greater return) in Snap than with Zenly.  Put another way, Mr. Fenton was not incentivized to broker a sale between Zenly and Snap that could result in a technology, publicity, or financial nightmare.

16.   Having insiders at Zenly and Snap, Benchmark Capital was best positioned and

financially incentivized to make Zenly and its assets appear attractive for Snap to buy.  Both Snap and Zenly would benefit, and eventually did benefit, from such a transaction.  Nonetheless, Zenly was keenly aware it was missing a vital piece of software technology for ZENLY, which was built on stale software technology.  Nor did Zenly have the necessary market traction to attract Snap into buying Zenly's assets or equity.  Zenly knew it needed to improve ZENLY's software technology before any sale could be brokered.

17.     In 2016, Zenly became aware of YouMap's beta testing of YOUMAP® (the "**Beta Testing**").  Antoine Martin, a co-founder and the President of Zenly, stated in an email to YouMap dated November 16, 2016 that Zenly and its "whole team" had been following YouMap's "work for a few years" and they "are all big fans of the stuff you did with National Geographic & now YouMap."

18.     Using their fandom of YouMap as a façade to gain access to the Beta Testing, Mr. Martin then confessed that ZENLY'S mapping software technology was a critical issue for Zenly and that Zenly would "LOVE to get to test [YouMap's] beta out."  Having admitted to Zenly's nefarious motive – and further conveying the utter shortcomings and failures of ZENLY and the software technology upon which it was based – Mr. Martin continued: gaining access to the Beta Testing "would make [Zenly's] product design & maps team ultra happy if you say yes!" YouMap did not respond to, nor was it made aware of during the relevant period of, that email.

19.     A reason why Mr. Martin adamantly sought access to the Beta Testing is because, during the November 2016 period, Zenly was in the midst of working on yet another "totally redesigned" ZENLY, so that Mr. Fenton and Mr. Lasky could broker a deal between Snap and Zenly.  ZENLY had to be "totally redesigned" because it was grossly behind the software technology curve that YouMap had improved, as Zenly spent the prior four years primarily

focusing on making location sharing between friends "fun".  Thus, Zenly needed and desperately sought access to the Beta Testing to gain access to and misappropriate new software technology in order for Fenton and Lasky to broker a block-buster deal that would reap hundreds of millions of dollars for Benchmark and provide Snap with the technology advancements Snap needed to support its public proclamation that Snap had invented a "brand new way to explore the world.".

20.   Upon information and belief, in furtherance of the strategy of gaining access to YOUMAP® and YouMap's Trade Secret Technologies, Zenly and its representatives met with Snap and its representatives on, or in the days leading up to, November 15, 2016, to discuss YOUMAP®, YouMap's mobile software application, and the Beta Testing.  In this regard, and evidencing that meeting, Individual Defendant Nicolas Fallourd tweeted on November 15, 2016, a picture of Snap's Spectacles — before they were available for online purchase — against a backdrop picture of "Zenly," captioned: "Guess what's happened today?" including hashtags of, among others, #snapchat #zenly #app #tech #fomo.  What happened on November 15, 2016 is that Zenly and Snap solidified their plan to access YouMap's Trade Secret software technology via the Beta Testing of YOUMAP® and steal as much of that Trade Secret Technology for purposes of incorporating it into their respective ZENLY and SNAP MAP products.  On the very next day, November 16, 2016, Mr. Martin — without coincidence, but, rather, in furtherance of this  strategy – sent his email to YouMap, desperately trying to win over YouMap with glowing accolades and praise.

21.   After that, various representatives of Zenly requested access to the Beta Testing, including Zenly's officers and directors.  While some of Zenly's representatives initially requested access to the Beta Testing disclosing their affiliation to Zenly, others did not.  That is because YouMap refused to grant access to any individual affiliated with a YouMap competitor,

such as Zenly, and directed its service provider for the Beta Testing not to include any YouMap competitors in the Beta Testing.  As a result, various Zenly representatives, who had initially sought invitation in November 2016, deliberately concealed their affiliation with Zenly by seeking to register or re-register in January or February 2017 for the Beta Testing using their *private* email addresses or an alias.  Critically, unbeknownst to YouMap, its service provider for the Beta Testing granted access for the Beta Testing to the certain Defendants using their private email address or an alias without YouMap's advance consent.

22.   Before gaining access to the Beta Testing, however, all participants, including those affiliated with Zenly, were required to, and did, contractually agree and obligate themselves to various terms and conditions, including confidentiality, non-use and nondisclosure obligations. This was an important requirement demanded of all participants in the Beta Testing, as all such participants would have access to YouMap's Trade Secret Technology by virtue of downloading and installing the executable file (i.e., the .apk, .ipa or .ipsw file) for, and otherwise learning and using, YOUMAP® and its mobile software application, including its various functionality, methods, systems and processes, as it existed at the time of the Beta Testing.  As Beta Testing would necessarily make available through access the Trade Secret Technology to the testing participants, including by way of the underlying source-code metadata and object code, library files, machine code and software algorithm systems YOUMAP® and its mobile software application, YouMap undertook legally protective measures to safeguard its Trade Secrets until such time that the Trade Secret Technology may be disclosed publicly. Such measures were important because, contrary to popular belief, mobile software applications (such as contained in .apk, .ipa or .ipsw files), including YOUMAP®, are able to be reverse engineered and analyzed, as the Defendants did here. Plus, insofar as any YOUMAP® mobile application software was

encrypted during the Beta Testing, Defendants used software tools to decrypt such software. The Beta Testing necessarily occurred in the United States, and not in France, as the YOUMAP® mobile software application, including its source-code metadata and object code, library files, machine code and software algorithm systems were hosted in servers within the United States.

23.   Agreement to, acceptance of and compliance with the various confidentiality, non-use and nondisclosure obligations, terms and conditions was a condition precedent for authorized access to YOUMAP® through the Beta Testing.  Any default, breach or violation of such obligations, terms and conditions by a Beta Testing participant  resulted in, as a matter of law, unauthorized access to YOUMAP®.

24.   The Zenly affiliated Beta Testing Individual Defendants did in fact access, use and learn YouMap's Trade Secrets through the Beta Testing of YOUMAP®.

25.   The Zenly affiliated Beta Testing Individual Defendants, at the direction and command of Zenly and Snap, did in fact misappropriate YouMap's Trade Secrets through the Beta Testing of YOUMAP®, including the executable file (i.e., the .apk, .ipa or .ipsw file) for YOUMAP® and its mobile software application, including its various functionality, methods, systems and processes, such as source-code metadata and object code, library files, machine code and software algorithm systems, as it existed during the Beta Testing.

26.   The access to YOUMAP® by the Individual Defendants – not as participants in the Beta Testing, but at the direction of Zenly and Snap to misappropriate the Trade Secret Technology – was per se an unauthorized access and unauthorized use not permitted or allowed by YouMap.

27.   Using YouMap's Trade Secret Technology and other confidential information that was accessed, learned and then taken in an unauthorized and unlawful manner through the Beta

Testing, Zenly incorporated the Trade Secrets to vastly improve ZENLY and then sold the Trade Secret Technology to Snap for approximately $213,000,000 in or about May 2017, as set forth in Snap's SEC filings publicly available on the SEC's EDGAR system (the "**Zenly/Snap Deal**").

28.    Thereafter, aware that YouMap was intending to publicly release YOUMAP®, Zenly and Snap engaged in a Homeric effort to not only integrate the stolen Trade Secret Technology into their respective mobile applications, as they did, but to release their apps – including SNAP MAP in SNAPCHAT – *before* YouMap could beat them into the market with its release of YOUMAP®.

29.    Zenly and Snap would not have consummated the Zenly/Snap Deal without having first stolen YouMap's Trade Secrets and confidential information, and then incorporating that valuable Trade Secret Technology into ZENLY and then, ultimately, into SNAPCHAT.

30.    As a direct and proximate cause of the Defendants' unlawful conduct, YouMap has suffered, and continues to suffer, substantial injuries.

## JURISDICTION AND VENUE

31.    This Court has federal question subject matter jurisdiction under 28 U.S.C. §1331 as this action arises under The Defend Trade Secrets Act of 2016, 18 U.S.C. §1836.

32.    The Court has jurisdiction of the patent infringement claim under Count V of this First Amended Complaint under 28 U.S.C. §§1331 and 1338(a).

33.    As to Counts I-IV, venue is proper in this judicial district under 28 U.S.C. §1391(b)(2) as a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated, in this judicial district.

34.    As to Count V, venue is proper in this judicial district pursuant to 28 U.S.C. §§ 1391 and 1400(b).

## THE PARTIES

35.    Plaintiff You Map Inc. is a Delaware corporation having its principal place of business in New York, NY.

36.    Defendant Snap Inc. is a Delaware corporation with a registered office c/o Corporation Service Company, 251 Little Falls Dr., Wilmington, DE 19808, and is registered as a foreign business corporation in New York maintaining a registered office, and appointing a registered agent in New York, care of Corporation Service Company, 80 State St., Albany, NY12207-2543.  Snap conducts substantial business in and generates a significant amount of revenue from citizens and residents of, New York from its offices at 229 W. 43rd St., New York, NY.  Snap has entered and continues to enter into contracts and agreements with citizens and residents of New York.

37.    Defendant Zenly S.A.S. is a French limited liability company by shares with a business address at 4- 6 Passage Louis Philippe 75011 Paris – France.

38.    Defendant Zenly Inc. is a Delaware corporation with a registered office care of The Company Corporation, 251 Little Falls Dr., Wilmington, DE 19808 and, upon information and belief, it was dissolved on May 22, 2017.

39.    Defendant Nicolas Dancie is a natural person residing, upon information and belief, in Paris, France, and was at all relevant times the Chief Experience Officer of Zenly.

40.    Defendant Noe Loterman is a natural person residing, upon information and belief, in California, and was at all relevant times a member of Zenly's growth team.

41.    Defendant Nicolas Fallourd is a natural person residing, upon information and belief, in Paris, France, and was at all relevant times a member of Zenly's Senior Product Designer and Product Manager.

42.    Defendant Jonathan Etaix is a natural person residing, upon information and belief,

in Paris, France, and was at all relevant times a a front-end developer for Zenly.

43.   Defendant Christophe Kerebel is a natural person residing, upon information and belief, in California, and was at all relevant times a Product Designer at Zenly.

44.   Defendant Roy Marmlestein is a natural person residing, upon information and belief, in New York, NY, and was at all relevant times an iOS Developer at Zenly.

45.   Each of the Defendants were the agents, servants, employees and co-conspirators of their co-defendants, and while performing the acts hereinafter alleged, were acting within the course, scope and extent of their agency and employment, in furtherance of the alleged conspiratorial goals, and were acting with the permission, consent and ratification of their co-defendants.

**BACKGROUND FACTS**

**A.   YOUMAP® AND YOUMAP'S VISION**

46.   YouMap's primary line of business is to furnish YOUMAP® for use by its users and the public.  It was available for download on Apple Inc.'s App Store.  The YOUMAP® app (i) provides a geospatial, social map connecting users to the world around them through online social networks, and (ii) enables users to share and view information describing the geographic location of various interests.

47.   It took several years for Mr. Constantinides to build YOUMAP® according to his vision.  One of Mr. Constantinides' main goals for YOUMAP® was to allow users to quickly ascertain (i) what was happening in a particular area and (ii) the emotive context behind what was happening, and then to provide a vast array of information to a user that was not easily visualized by other social-media platforms.  This is why YouMap describes YOUMAP® as "an 'atlas' of human events."

48.    YOUMAP® revolutionized the nature of the data displayed on a real-time map by creating a medium to communicate spatial data.  YOUMAP® provides users with the platform to identify the location, such as where a user is or intends to go, and – *at the same time* – allows that user to see what is happening in that location and remain connected to developments therein.

**B.    YOUMAP EXPANDS THE USE-CASE OF REAL-TIME MAPS**

49.    In 2015, Mr. Constantinides wanted to build a new kind of social platform he called a "real-time social and emotional mapping system" enabling the visualization of data not generally visualized in other social platforms.  This system went beyond the state of the art at the time which did not adequately relay the semantic meaning of information at higher zoom levels, without further clicking on the information to reveal it.

50.    To do that in YOUMAP®, users can join already-created communities or form user created communities to drive action on social and personal matters relevant to the user and the user's community, such as identifying the best local nightlife scene or providing relevant information on the scale and scope of public demonstration or protests.

51.    YOUMAP® also allows users to collaborate with other users to create engagement on social or public matters.  YOUMAP® was developed to provide users with the tools to publicize what is happening at various events.  For example, if a surfer-user wants to know real-time surf conditions at a particular beach, the surfer-user would use YOUMAP® to review what other surfer-users at that beach were reporting on those conditions in YOUMAP®.  Other use cases entail sharing real-time ratings or reviews on restaurants, coffee houses or literally any other social club.  YOUMAP® is intended to drive user engagement for local, regional, national, and worldwide events.

**C.    YOUMAP'S ADAPTIVE VISUALIZATION SYSTEM**

52.   YOUMAP®'s novel Technologies deliver content through a revolutionary visualization system that overcomes multiple practical limitations of running a social network on a small map running on a small mobile phone screen.   YOUMAP® had to be built, and was built, to display a vast amount of visual content on a mobile phone screen, all the while maintaining legible and relevant, semantical information at all possible zoom levels on a map. Prior to YOUMAP®, such an objective had never been achieved as the technologies to do so did not exist.

53.   Importantly, with YOUMAP®, Mr. Constantinides solved the industry-wide problems of how to prevent content and information from becoming too busy and overlapping on a mobile phone screen, how to deliver content and information in legible format, how to maintain semantic cues at high-zoom levels where mobile-phone screen space becomes less available, and how to prioritize information-order in terms of unique user relevance.

54.   For example, at the time Mr. Constantinides started to consider a solution for those issues, the predominant method of depicting consolidated content on a map was with "map markers."   Map markers merely identify the number of content-events for a given spatial area. To Mr. Constantinides, using already-existing technology was not an option because YOUMAP® would be unable to communicate the contextual and relevant explanation of what was behind those map markers.   In other words, the then-existing map marker technology utilized by other map-based social media platforms portrayed only a content-concentration number and otherwise lacked qualitative significance:

55.   The inferior method of using "map markers" to display content concentrations was predominantly used by other social-media networks, including, upon information and belief, the SNAP MAP module in SNAPCHAT.

14

56.    Other social-media networks also hid information behind the content-concentration numbers, such that the only information that was conveyed was the *number* of events — but not any relevant *context*.  As a result of this inferior technology, a user had no way to determine the *relevance* of the content concentration, other than by clicking on the content-concentration number.  For example, in "Periscope" – a then existing map-based social media platform – the content-concentration numbers prevented a user from understanding *any* of the semantic data underlying the content-concentration numbers.

57.    Similarly, "Foursquare" – another then existing map-based social media platform – used similar technology, which only showed the content-concentration of relevant businesses, again, all without revealing *any* semantic data underlying the content concentration number.

58.    Instead of using a superficial content-concentration technology as employed by then-existing map-based social media apps, Mr. Constantinides created, invented, and built a system for adaptive visualization of relevant content through intelligently detailed previews of a subset of the total post at any given zoom or pan level.  Such system is focused as much on hiding data at any given time as it is displaying data to make the subset of information relevant. This novel technology utilizes ephemeral "post bubbles" – a form of biomimicry of the natural physics of bubbles in nature.   His vision, ultimately incorporated into YOUMAP® via its underlying Trade Secret Technology, was for those bubbles to pop in and out dynamically previewing snippets of posted content *adaptively* as a user zooms and pans in order to preview posted, relevant content.  For example, when a user pans through the interface, new post bubbles sprout throughout the map providing a unique bird's eye perspective of events on an individual level and a societal "crowd" level. Unlike the prior stale technology, as depicted above, YouMap's bubbles provided users with semantic information *without* the need for opening each

individual social post.

59.   The Trade Secret Technology comprising the YOUMAP® app prevents overlapping, crowding bubbles (which was the inferior technology used by Zenly before it stole YouMap's Trade Secrets) and displays enough bubbles only as can be comprehended intelligently on a user's screen at any given time.

60.   These bubbles may expand even further, like flags unfurling to show even fuller content if the screen space is available.   The bubbles do not overlap, which is a critical feature. A critical functional feature of the underlying Trade Secret Technology is YOUMAP®'s ability to detect the available screen space and then display only content previews that the screen can accommodate at a given screen axis.   Furthermore, the bubbles themselves can move, so if the map is panned left, the bubble(s) may move slightly to the left beforehand requiring the system to know where the screen ends but also providing for collision detection mechanism to prevent such overlap.   None of these features and functionality existed prior to the development of YOUMAP®.

61.   A second critical functional feature of YOUMAP® is its density aggregation technology, which may be embodied in a "heat map" form of display. The YouMap heat map provides for methods of tracking and visualizing social activity and social patterns just as a weather man might track weather events. This density visualization acts as a visual navigation aide directing the user where to find more content on the map and how much content they will find if they zoom to a given position Without density visualization acting as a guide, a user would not know where more content may be visually displayed.   The combination of the dynamically displayed post bubbles which react to user map movements *and* the heat map results in a synergistic, unprecedented power and functionality – providing a YouMap user with an

exceptional user experience that did ***not*** exist before YOUMAP®.  This is important, not because YouMap invented heat maps, but because YOUMAP® combined and integrated the functionality of the density visualization and the adaptive bubbles: the first providing the guide to browse content, and the second intelligently displaying that content so the user did not have to click again to understand whether the content is relevant.

### D.   YOUMAP'S RANKING AND RELEVANCY SYSTEM

62.   YouMap further revolutionized a solution to another issue: how to provide relevant content even more digestible on the limited space of a mobile phone screen.

63.   While various social media platforms may provide users with trending topics (*e.g.*, Reddit, Facebook, Twitter), YouMap's Trade Secret Technology focuses on how a social media platform can communicate and operate relevant information on a real-time map.  Contrarily, other social media platforms utilize an initial page that displays trending posts or posts that generate a higher relevance value than other posts.  YOUMAP®'s Trade Secret Technology, on the other hand, functionally displays relevant content or content that may otherwise have a higher value than other posts depending on the user's zooming or panning activity, such that YOUMAP® may intelligently display content having higher micro-relevance than lower macro-relevance as the user zooms or pans into geospatial regions on the map.

64.   Previously, then-existing social-media platforms' software algorithm solution was fairly simple: rank content based on predefined relevance levels, such as, for example, "upvotes" or time (when the content was posted), and then list the highest-ranking relevance post in first position with less relevant content following thereafter.  YouMap's technology, on the other hand, does not randomly display bubbles simply due to zooming or panning activity on the map. In contrast, YouMap's software algorithms attach the zoom level at which the bubbles appear

through a passive retrieval method dependent on both macro- and micro-relevance analysis.

65.   Additionally, Mr. Constantinides changed the way maps were to be used on social-media networks. Historically, a map functioned as an identifier of location.  YouMap expands the use-case by showing users what is happening – *in real time* – in a particular location.

### E.   DEVELOPMENT OF YOUMAP®

66.   YOUMAP® was developed by YouMap with internal and external software, technology, and infrastructure developers over several years.  Those professionals were subject to confidential, non-disclosure and non-use obligations with respect to YouMap's non- public, proprietary, and confidential intellectual property and trade secrets, *i.e.*, the Trade Secrets.  Upon the development of any intellectual property, those professionals assigned sufficient right, title, and interest to YouMap.

67.   Some of the technology used in YOUMAP®, such as the map underlayment, is pulled by application programming interfaces ("**API**") from technology services or libraries of other providers.

68.   YouMap connects its Mobile App to the mapping libraries of MapBox, Inc. ("**MapBox**") through an API.  In general, MapBox offers mapping and located-based solutions for development and mobile applications.  YouMap has a license from MapBox to use its mapping technology in YOUMAP® (the "**map underlayment**").

69.   YouMap connects to MapBox's mapping libraries so that it would not have had to incur the additional time and expense of independently developing a separate mapping technology or otherwise independently granularly mapping the world.

70.   YOUMAP®'s user-interface (the "**UI**") is built on the map underlayment.  The map underlayment displays information traditionally seen on maps, such as streets and towns.  It also

identifies businesses, vendors, and other landmarks, such as restaurants, coffeehouses, bars, events, attractions, hotels, parks, museums, and theatres.  The map underlayment is owned by, upon information and belief, MapBox or its licensors; it is not owned by YouMap.

71.   The UI is critical to create an immersive user and location-based experience.  A competitive advantage of YOUMAP® is the capability to create sub-environment or sub-communities on the UI.

72.   For example, if a group of friends attends an event at a neighborhood social club, they could create on the map underlayment a sub-community for that club identifying whether the club's scene is trendy enough for others to attend.  In its narrowest sense, the UI allows users to provide real-time micro reviews or information about a particular experience at a certain geographic location.  The UI's real-time micro-review functionality harnesses and facilitates user interaction on daily basis.  As user engagement grows, YOUMAP® becomes the go-to source for real-time information on user-created environments and communities, along with more public environments and communities, such as political demonstrations and protests.

73.   The UI allows a user to create environment and communities visually displayed on the UI using, what YouMap calls, MapMojis ("**MapMoji**").  A MapMoji is an icon layer symbolizing an environment, community or mood on the UI further functionalized through a corresponding text box allowing a user to describe the environment, community, or mood.

74.   YOUMAP® offers many MapMojis for its users to communicate subjective, emotive, and semantic information contextually and symbolically over a map interface.

F.   **BETA TESTING / MISAPPROPRIATION OF TRADE SECRETS**

75.   In the summer of 2016, YouMap initiated the Beta Testing of YOUMAP®.  The Beta Testing was hosted through Apple's beta testing tool "TestFlight," the services for which

are located within the United States, through which a beta version of YOUMAP® was available for download, use and testing by testing participants who accepted various legal terms and conditions of the Beta Testing via a confidentiality and non-disclosure contract (the "**Confidentiality Agreement**").   Among the terms and conditions of the Confidentiality Agreement, each Beta Testing participant, including the respective Individual Defendant participants, contractually obligated themselves to maintain the confidentiality of their Beta Testing of YOUMAP® and the YOUMAP® app in its entirety, not use their Beta Testing of YOUMAP® and the YOUMAP® app for any purpose other than Beta Testing, and not disclose their Beta Testing experience of YOUMAP® and the YOUMAP® app to anyone for any reason (other than expressly allowed by the Confidentiality Agreement), including any of YouMap's confidential or proprietary information, which included any and all information about YOUMAP® that may be learned through the Beta Testing process. Put simply, YouMap sought to avoid providing YOUMAP® blueprint to its competitors by requiring everyone participating in the Beta Testing, including the Defendants, to sign the Confidentiality Agreement to protect YouMap's Trade Secrets.

76.   Additionally, pursuant to the express terms and conditions of the Confidentiality Agreement, all Beta Testing participants, including the respective Individual Defendant participants,  were granted "a limited, non-exclusive, non-assignable, non-sublicensable license to access, download and use [YOUMAP®] for which you have been selected as a beta-tester and any related documentation available online, solely for beta-testing purposes for a limited time and subject to these [terms and conditions]."

77.   Critically, as between each Beta Testing participant, including the respective Individual Defendant participants, pursuant to the express terms and conditions of the

Confidentiality Agreement, each Beta Testing participant acknowledged, represented, and agreed that YouMap "owns all right, title and interest in the Beta App, including but not limited to intellectual property rights."

78.   In addition, pursuant to the express terms and conditions of the Confidentiality Agreement, each Beta Testing participant, including the respective Individual Defendant participants, acknowledged, represented and agreed to not: "(a) modify, reverse engineer, decompile, or disassemble [YOUMAP®]; (b) rent, lease, loan, sell, sublicense, distribute, transmit, or otherwise transfer [YOUMAP®]; (c) make any copy of or otherwise reproduce [YOUMAP®]; or (d) display [YOUMAP®] to unauthorized third parties without the [YouMap's] authorization."

79.   Access to YOUMAP® by Beta Testing participants was conditioned upon their express agreement to, acceptance of and compliance with the various confidentiality, non-use and nondisclosure obligations, terms, and conditions.  Any failure, breach, or default of any such obligation, term or condition renders an access *unauthorized*.

80.   Once in the Beta Testing, Zenly and Snap directed, ordered, or otherwise caused its representatives, *i.e.*, the various Individual Defendant Beta Testing participants, to specifically access, learn, steal, and disclose YouMap's non-public, proprietary and confidential intellectual property and trade secrets, *i.e.*, the Trade Secret Technology, all for the benefit of Zenly, and ultimately, Snap.  The various Individual Defendant Beta Testing participants complied with Zenly's  and Snap's directive and strategy and disclosed and provided to Zenly, and ultimately Snap, all of the Trade Secret Technology accessed, learned, and stolen by the Individual Defendant Beta Testing participants.  As such, not only did Zenly steal the Trade Secret Technology from YouMap, but Zenly then incorporated YouMap's Trade Secret Technology

into ZENLY's then latest iteration, which was released in or about March 2017 — shortly after Zenly and its representatives, the Individual Defendant Beta Testing participants, infiltrated the Beta Testing.

81.   YouMap offered access to the Beta Testing by invitation only, meaning access to the Beta Testing could occur only after YouMap's service provider either invited a participant or a request to participate by a participant was accepted by YouMap's service provider.

82.   Zenly therefore made a concerted effort to gain access to the Beta Testing in late 2016 for the purpose of accessing, learning and stealing YouMap's Trade Secret Technology, for purposes of incorporating that Technology into ZENLY and, ultimately, SNAP MAP, by and through their employees and representatives, the Individual Defendants.

83.   Individual Defendant Nicolas Dancie was accepted into the Beta Testing on February 1, 2017, and engaged in four (4) sessions during the Beta Testing.

84.   Individual Defendant Noe Loterman was accepted into the Beta Testing on February 1, 2017 and registered therefor using a first name of "Nolowter" and a last name of "Nolowter."   Individual Defendant Noe Loterman intentionally did not use his Zenly email address or his legal name because he did not want to identify as a Zenly employee.

85.   Individual Defendant Nicolas Fallourd was accepted into the Beta Testing on February 1, 2017 and registered therefor using what appears to be his legal name, Nicolas Fallourd.  Yet, Individual Defendant Nicolas Fallourd did not list his Zenly email address during the registration process because he did not want to identify as a Zenly employee.  As late as December 10, 2016, Individual Defendant Nicolas Fallourd publicly posted on social media a photo of a Christmas tree ornament that was Snap's SNAPCHAT ghost logo with various hashtags.  The social media post picture by Individual Defendant Nicolas Fallourd is evidence of

and demonstrates the concerted effort and collusion by Zenly and Snap to misappropriate YouMap's Trade Secret Technology.

86.   Individual Defendant Jonathan Etaix was accepted into the Beta Testing on November 29, 2016 listing an email address other than his Zenly email address and then again on January 10, 2017 listing another email address other than his Zenly email address.  Individual Defendant Jonathan Etaix did not list his Zenly email address during the registration process because he did not want to identify as a Zenly employee.  Individual Defendant Jonathan Etaix installed version 0.5 of the YOUMAP® mobile software application, including its underlying source-code metadata and object code, library files, machine code and software algorithm systems, on February 1, 2017, from an IP address in New York and engaged in four (4) sessions during the Beta Testing. Thereafter, upon information and belief, shared the downloaded material with the other Defendants, each of whom used and stole YouMap's Trade Secret Technology and breached the Confidentiality Agreement.  On February 3, 2017, just two days after Etaix gained access thereto, Zenly released an update to its ZENLY mobile software application that contained YouMap's Trade Secret Technology, along with similar updates on March 15 and 20, 2017. Snap likewise updated Snap Map on February 3, 2017, along with similar updates thereafter.

87.   Individual Defendant Christophe Kerebel was accepted into the Beta Testing on February 1, 2017 and registered therefor using a first name of "Christophe" and a last name of "Christophe."  Individual Defendant Christophe Kerebel did not list his Zenly email address or his legal name during the registration process because he did not want to identify as a Zenly employee.

88.   Individual Defendant Roy Marmlestein was accepted into the Beta Testing on

23

February 1, 2017.  Individual Defendant Roy Marmlestein did not list his Zenly email address during the registration process because he did not want to identify as a Zenly employee.

89.   In a concerted, coordinated, conspiratorial fashion, Individual Defendants Roy Marmlestein, Christophe Kerebel, Jonathan Etaix, Nicolas Dancie, Noe Loterman and Nicolas Fallourd sought to and did participate and downloaded a beta version of YOUMAP® at the direction and instruction of the other Defendants, who, at all relevant times, controlled and directed them and each other to engage in the actions and inactions alleged in this First Amended Complaint.  Despite participating in the Beta Testing, none of the Individual Defendants furnished any comments to YouMap with respect to YOUMAP®, thereby evidencing all such Individual Defendants were not participating in the Beta Testing for the testing's intended purpose, but rather, those Defendants participated in the Beta Testing solely to access, learn, discover and steal YouMap's Trade Secret Technology.

90.   Access by the Individual Defendants, and ultimately Zenly and Snap, to YOUMAP® was **unauthorized**.

### G.   THE TRADE SECRETS

91.   Once the various Individual Defendants were inserted into YouMap's Beta Testing program, thereby providing Zenly, and ultimately, Snap, with direct unauthorized access to YOUMAP® and the Trade Secrets comprising YOUMAP® and its mobile software application, including the underlying source-code metadata and object code, library files, machine code and software algorithm systems, the Individual Defendants, at the direction of Zenly and Snap, misappropriated the non-public, proprietary, and confidential intellectual property comprising YouMap's Trade Secrets and breached the Confidentiality Agreement.

92.   Understanding the nature of the misappropriated Trade Secrets requires not just an

understanding of YOUMAP®, but the specific novel functionality, methods, processes, systems, software algorithms, and operative interfaces comprising YOUMAP®, all of which may be accessed, viewed, used, learned, operated, dissected, and manipulated by a user, in general, and the Individual Defendants, in particular, who participated in the Beta Testing.

93.     The Trade Secret Technology, created by Mr. Constantinides and comprising extremely valuable assets of YouMap, of which Defendants misappropriated as described herein, may be summarized as including, but not necessarily limited to, the following technologies, which were available through the download and installation of the executable file for the YOUMAP® Beta Testing, including source-code metadata and object code, the library files and machine code:

**a)   Adaptive Visualization System/Method/Process and Software Algorithms.**

i)     A primary Trade Secret component of YOUMAP® is its adaptive visualization system/method/process (the adaptive visualization system/method/process, and all of its functional and visual features, variations, expressions and embodiments, and the various steps comprising its component methods and processes, including the mobile software application and its underlying source-code metadata and object code, library files, machine code and software algorithm systems, all as implemented and expressed by and through various software algorithms, collectively referred to as the "Adaptive Visualization System/Method/Process") which, as set forth elsewhere in this First Amended Complaint, did not exist prior to YOUMAP®.

ii)     The Adaptive Visualization System/Method/Process, and its implementing software algorithms, create and generate the unique visualization functionality displayed on a user's device, such as a cell phone, that provides the user with an interactive

function that allows for the display of relevant, semantic information at various levels – from a close-up, zoomed-in view to a wider, zoomed-out view, all the while providing the user with variable semantic information that would allow the user to decide whether to view more or less closely.  The Adaptive Visualization System/Method/Process, and its implementing software algorithms, allows YOUMAP® to display a vast amount of visual content on a mobile phone screen, all the while maintaining legible and relevant, semantical information at all possible zoom levels on a map.  This software technology did not exist before YOUMAP®, and neither ZENLY nor Snap Map utilized such software technology prior to the Beta Testing.   The Adaptive Visualization System/Method/Process, and its implementing software algorithms, results in a specific operative, interactive functionality of YOUMAP®, which may be viewed, learned and sufficiently understood for purposes of misappropriation by downloading, installing, accessing, using, investigating, dissecting, manipulating, reverse engineering and disassembling YOUMAP®.

iii)    The Adaptive Visualization System/Method/Process, and its implementing software algorithms, prevents content and information from becoming too busy and overlapping on a mobile phone screen, all the while delivering content and information in legible format, maintain semantic cues at high-zoom levels where mobile-phone screen space becomes less available, and prioritizing information-order in terms of unique user relevance.  Each of these specific elements and features of the Adaptive Visualization System/Method/Process, as implemented by and through its software algorithms, are operative, interactive Trade Secret components of YOUMAP®, all of which did not exist prior to YOUMAP® and neither ZENLY nor Snap Map utilized such elements and

features prior to the Beta Testing.   These specific operative, interactive functional elements and features of the Adaptive Visualization System/Method/Process, expressed and implemented by its software algorithms, may be viewed, learned, and sufficiently understood for purposes of misappropriation by downloading, installing, accessing, using, investigating, dissecting, manipulating, reverse engineering and disassembling YOUMAP® and its mobile software application and its underlying source-code metadata and object code, library files, machine code and software algorithm systems.

iv)      The Adaptive Visualization System/Method/Process, and its implementing software algorithms, further features the novel, operative, interactive visual functionality of ephemeral "post bubbles" – a form of biomimicry of the natural physics of bubbles in nature – and further comprises the Trade Secrets.   YOUMAP®'s functional "post bubbles" pop in and out *adaptively* as a user zooms and pans in order to preview posted, relevant content and a user's device will, based on YOUMAP®'s proprietary systems and methods, only display enough bubbles as can be comprehended intelligently on a user's screen at any given time.   A further critical interactive, functional feature of the Adaptive Visualization System/Method/Process, as implemented by its software algorithms, is that the post bubbles do not overlap, a feature that did not exist on map-based social media apps, including ZENLY and Snap Map, until YOUMAP®.   A critical functional feature of the Adaptive Visualization System/Method/Process, and its implementing software algorithms, is its ability to detect the available screen space and then display only content previews that the screen can accommodate at a given screen axis.   Furthermore, the bubbles themselves can move, so if the map is panned left, the bubble(s) may move slightly to the left beforehand.   None of these features and

functionality existed prior to the development of YOUMAP® and neither ZENLY nor Snap Map utilized such features and functionalities prior to the Beta Testing.  And, importantly, these specific operative, interactive functional elements and features of the Adaptive Visualization System/Method/Process, as implemented and expressed by its software algorithms, may be viewed, learned and sufficiently understood for purposes of misappropriation by downloading, installing, accessing, using, investigating, dissecting, manipulating, reverse engineering and disassembling YOUMAP® and its mobile software application and its underlying source-code metadata and object code, library files, machine code and software algorithm systems.

v)      The Adaptive Visualization System/Method/Process, and its implementing software algorithms, further generates the novel, operative, interactive visual functionality feature of incorporating YOUMAP®'s density aggregation software technology in a "heat map" form of display, thereby providing an operative, interactive visual "density visualization" feature to inform a user where more content may be visually displayed.  The combination of post bubbles *and* heat maps is a further visual, interactive functional feature of the Adaptive Visualization System/Method/ Process, and is expressed and implemented by its software algorithms, thereby resulting in a synergistic, unprecedented power and functionality and exceptional user experience that did not exist before YOUMAP®.  The combination of YOUMAP®'s density aggregation software technology, which may be in the form of YOUMAP®'s adaptive "post bubbles" or visually expressed in any other format providing the same functionality, with heat maps provides a user with an interactive, operative functional "guide" to browse content and an intelligent means of displaying that content so the user would not have to click

again to understand whether the content is relevant.  These specific operative, interactive functional elements and features of the Adaptive Visualization System/Method/Process, expressed and implement by its software algorithms, may be viewed, learned and sufficiently understood for purposes of misappropriation by downloading, installing, accessing, using, investigating, dissecting, manipulating, reverse engineering and disassembling YOUMAP® and its mobile software application and its underlying source-code metadata and object code, library files, machine code and software algorithm systems.

b)      **Ranking and Relevancy System/Method/Process and Software Algorithms.**

i)      Another primary Trade Secret component of YOUMAP® is its ranking and relevancy system/method/process and software algorithms (the ranking and relevancy system/method/process, and all of its functional and visual features, variations, expressions and embodiments, and the various steps comprising its component methods and processes, including the mobile software application and its underlying source-code metadata and object code, library files, machine code and software algorithm systems, all as implemented and expressed by and through various software algorithms, collectively referred to as the "Ranking and Relevancy System/Method/Process") which, as set forth elsewhere in this First Amended Complaint, did not exist prior to YOUMAP® and neither ZENLY nor Snap Map utilized such features and functionalities prior to the Beta Testing.

ii)     YOUMAP®'s Ranking and Relevancy System/Method/Process System, and its implementing software algorithms, provides for the functional display of relevant content in a more digestible fashion on the limited display space of a mobile phone

screen.

        iii)     The Ranking and Relevancy System/Method/Process System, and its implementing software algorithms, provides for the functional display of relevant content or content that may otherwise have a higher value than other posts depending on the user's zooming or panning activity.  As a result of this functionality, YOUMAP® intelligently displays content having higher micro-relevance than lower macro-relevance as the user zooms or pans into geospatial regions on the map.  Further, in its operative, functional state, the Ranking and Relevancy Ranking and Relevancy System/Method/Process System, and its implementing software algorithms, provides for and attaches the zoom level at which "post bubbles" appear through a passive retrieval method dependent on both macro- and micro-relevance analysis.  The Ranking and Relevancy Ranking and Relevancy System/Method/Process System, and its implementing software algorithms, further provides for the generation of showing users what is happening – *in real time* – in a particular location.  None of these features and functionality existed prior to the development of YOUMAP® and neither ZENLY nor Snap Map utilized such features and functionalities prior to the Beta Testing.  Importantly, the specific operative, interactive functional elements and features of the Ranking and Relevancy Ranking and Relevancy System/Method/Process System, as implemented and expressed by and through its software algorithms, may be viewed, learned, and sufficiently understood for purposes of misappropriation by downloading, installing, accessing, using, investigating, dissecting, manipulating, reverse engineering and disassembling YOUMAP® and its mobile software application and its underlying source-code metadata and object code, library files, machine code and software algorithm

systems.

c)  **Interactive User Interface System/Method/Process and Software Algorithms.**

      i)      Another primary Trade Secret component of YOUMAP® is its functional, interactive user interface system/method/process and underlying software algorithms (the interactive user interface system/method/process, and all of its functional and visual features, variations, expressions and embodiments, and the various steps comprising its underlying component methods and processes, including the mobile software application and its underlying source-code metadata and object code, library files, machine code and software algorithm systems, all as implemented and expressed by and through software algorithms, collectively referred to as the "Interactive User Interface System/Method/Process") which, as set forth elsewhere in this First Amended Complaint, did not exist prior to YOUMAP®.

      ii)      The Interactive User Interface System/Method/Process User Interface, and its implementing software algorithms, provides a user of YOUMAP® the functional ability to create sub-environment or sub-communities on the interface for display.  The functional Interactive User Interface System/Method/Process provides users with the ability to create or generate real-time micro reviews or information about a particular experience at a certain geographic location.  This capability and software technology did not exist before YOUMAP®.  In addition, the real-time micro-review functionality of the Interactive User Interface System/Method/Process harnesses and facilitates user interaction on daily basis.  As a result, over time, as user engagement grows, the Interactive User Interface System/Method/Process provides the user a comprehensive source for real-time information on user-created environments and communities, along

with more public environments and communities, such as political demonstrations and protests.   None of these features and functionality of the Interactive User Interface System/Method/Process existed prior to YOUMAP® and neither ZENLY nor Snap Map utilized such features and functionalities prior to the Beta Testing.   Importantly, these specific operative, interactive functional elements and features of the Interactive User Interface System/Method/Process, as implemented and expressed by and through its software algorithms, may be viewed, learned and sufficiently understood for purposes of misappropriation by downloading, installing, accessing, using, investigating, dissecting, manipulating, reverse engineering and disassembling the YOUMAP® app.

iii)     The Interactive User Interface System/Method/Process, and its implementing software algorithms, further provides the functional ability of allowing users to create environment and communities visually displayed on the User Interface using a plethora of unique emojis appropriately named "MapMojis" by YouMap.   A MapMoji is an icon layer symbolizing an environment, community or mood on the User Interface that is user-operated through the functionality of the Interactive User Interface System/Method/Process User Interface that is further functionalized through a corresponding, user-operated text box allowing a user to describe the environment, community, or mood.   None of these user-operative features and functionality existed prior to the development of YOUMAP®.   Importantly, the specific operative, interactive functional elements and features of the Interactive User Interface System/Method/Process, as implemented and expressed by and through its software algorithms, may be viewed, learned, and sufficiently understood for purposes of misappropriation by downloading, installing, accessing, using, investigating, dissecting,

manipulating, reverse engineering and disassembling the YOUMAP®.

      iv)    The Interactive User Interface System/Method/Process, and its implementing software algorithms, further provides the functional ability of a semantic posting system.   The semantic posting system of the Interactive User Interface System/Method/Process provides a process for selecting a symbol to convey a current mood or feeling onto the map.   This may be accomplished by a user selecting an associated emoji or symbol or by automatically updating on a variety of factors as determined by the software algorithm, including, for example, a user's location, time of day, weather patterns, whether the user is at a specific venue, etc.   None of these features and functionality existed prior to the development of YOUMAP®.   Importantly, the semantic posting system of the Interactive User Interface System/Method/Process, as implemented and expressed by and through its software algorithms, may be viewed, learned, and sufficiently understood for purposes of misappropriation by downloading, installing, accessing, using, investigating, dissecting, manipulating, reverse engineering and disassembling YOUMAP®.

94.   The above stated systems, methods and processes comprising the Trade Secret Technology were in fact viewed, learned, and sufficiently understood by Defendants, each and all of them, by and through the Beta Testing, for purposes of misappropriating that Trade Secret Technology.   Defendants, each and all of them, did in fact misappropriate the Trade Secrets through their downloading, installation, accessing, use, investigation, dissection, manipulation, reverse engineering, and disassembly of YOUMAP® and its underlying source-code metadata and object code, library files, machine code and software algorithm systems, and then incorporated the stolen Trade Secret Technology into ZENLY and SNAP MAP.

95.   The above stated systems, methods and processes comprising the Trade Secret Technology are based on underlying software algorithms, which themselves, also comprise the Trade Secret Technology.   By accessing, viewing, learning, and sufficiently understanding YOUMAP® as set forth in the preceding paragraph, Defendants, each and all of them, were able to misappropriate the software algorithms, in whole or in part and in various combinations thereof, by and through their downloading, installation, accessing, use, investigation, dissection, manipulation, reverse engineering, and disassembly of YOUMAP®, and then incorporating that Trade Secret Technology into ZENLY and SNAP MAP.

96.   YouMap is the sole owner and proprietor of all right, title and interest in and to the Trade Secrets.   Defendants' downloading, accessing and use of YOUMAP® through the Beta Testing was unauthorized.   Defendants, each and all of them, lacked authorization or permission to download, access and use YOUMAP® and its mobile software application and its underlying source-code metadata and object code, library files, machine code and software algorithm systems.

97.   YouMap undertook responsible steps to safeguard its Trade Secrets.   YouMap stored them in a secure location and limited access only to individuals having a need to know or otherwise legally contractually obligating to maintain confidences, not disclose them, and not use them other than for the purpose for which disclosure is made, such as in the Beta Testing.

98.   YouMap implemented protective measures to prevent the Trade Secret Technology from unauthorized use, so that others could not unjustifiably reap the benefits of YouMap's extensive investment in labor and innovation of the Trade Secrets.   Prior to the Beta Testing, wherein YouMap allowed only limited access to the Trade Secrets to the Individual Defendants for purposes of that testing, they had no knowledge of and did not use any of YouMap's Trade

Secrets.

99.   The Trade Secrets have independent economic value from not being generally known to, and not readily ascertainable through proper means, by another person.  The Trade Secrets are crucial to business growth, efficiency, profit generation, increased market shares, increased customer interaction, goodwill creation and growth, increased technological efficiencies, cost savings and other increased customer interaction and revenue.

## H.   ZENLY AND SNAP INCORPORATE THE MISAPPROPRIATED TRADE SECRETS INTO THEIR PRODUCTS

100.   Before the Individual Defendants' participation in the Beta Testing, neither Zenly nor Snap were aware of or used any of the Trade Secret Technology.

101.   After misappropriating the Trade Secrets, Zenly and Individual Defendants Marmlestein, Kerebel, Etaix, Dancie, Loterman and Fallourd, used and incorporated the Trade Secrets into ZENLY.

102.   Had Zenly approached Snap with its former iteration of ZENLY, Snap would not have purchased Zenly's intellectual property.  That was because the then version of ZENLY was only good as a "people-finder" and that is what Zenly had focused its development and marketing.  Prior to its incorporation of the misappropriated Trade Secrets, ZENLY did not have any software technology for Snap's intended use in SNAPCHAT, namely, to geographically map semantic information for its users.

103.   Additionally, and for the sake of clarity, prior to the Zenly/Snap Deal, Snap did not have a mapping platform in or for SNAPCHAT.  What SNAPCHAT needed, however, was YOUMAP®'s Trade Secret Technology, as YOUMAP® had not only the basic people-finder software technology of ZENLY, but also the cutting-edge functionality to display semantic information on a map (a software technology both ZENLY and SNAPCHAT were lacking).

104.   Neither Zenly nor Snap could have developed the functionality each was lacking in ZENLY and SNAPCHAT, respectively, between the period of February 1, 2017 up to and through the date of SNAPCHAT's public release of its Snap Map component.

105.   In the Zenly/Snap Deal, Zenly sold ZENLY to Snap, but Zenly did not have rights in the Trade Secrets to sell that software technology to Snap.  Even worse, Snap was aware that Zenly lacked any rights in and to the misappropriated Trade Secret Technology, thereby acting as a complicit co-conspirator in the theft and misappropriation of YouMap's valuable Trade Secrets.  Yet, Snap incorporated the Trade Secrets into SNAPCHAT, substituting the stolen Trade Secrets for the SNAP MAP software technology developed internally by Snap. SNAPCHAT contains the misappropriated Trade Secrets.

106.   After YouMap publicly released YOUMAP® in July 2017 into a market in which Snap had already incorporated the Trade Secrets into SNAPCHAT which it wrongfully acquired in the Zenly/Snap Deal, various market participants and users commented on the confusion and the substantial similarities of the mobile applications.  But the market was not commenting entirely on the similarities or confusion between YOUMAP® and SNAPCHAT.  Instead, they were primarily talking about how SNAPCHAT copied ZENLY.

107.   Even worse, however, is that Snap and Zenly communicated to the market that each of them were responsible for the development of the stolen Trade Secret Technology that they respectively incorporated into their respective products.  As a direct and proximate cause of the foregoing, the market and users are confused about the true developer and source of the development and ownership of the Trade Secret Technology.

108.   It was not just pundits and critics positing that Snap could not have developed this software technology in the rushed time period between acquisition and release, or that the

Zenly/Snap Deal did not make any sense for Snap since Snap was buying software technology from Zenly that the public knew from their use of ZENLY was only to find people, not display semantic information on a map.  Indeed, even Snap's own employees questioned the Zenly/Snap Deal.  That was because in the summer of 2016, a team of Snap engineers begin building the SNAP MAP feature for SNAPCHAT, which would display people's locations and publicly posted stories on a map and which would have been a competitor product to both Zenly and YouMap.  Because SNAPCHAT did not have a mapping feature, it had to either internally develop one or purchase the software technology.  Zenly and Snap could not have independently developed the software technology comprising the Trade Secrets in the period of time between when Defendants misappropriated them from YouMap and the release of their respective mobile applications.  So, Snap did the latter, and incorporated the misappropriated Trade Secret Technology straight into SNAPCHAT as SNAP MAP.

109.    One month before Snap was scheduled to release SNAP MAP in June 2017, the Zenly/Snap Deal closed, and Snap's internally developed SNAP MAP was not used.  Instead, Snap used the stolen Trade Secrets in SNAPCHAT.  Snap's own employees were confused and surprised by the Zenly/Snap Deal, particularly with the speed by which the Trade Secret Technology stolen by Zenly was incorporated into SNAPCHAT and with Snap's rush to market therewith.

## I.    SNAP ACQUIRES ZENLY

110.    With Zenly's unlawful incorporation of the Trade Secrets into ZENLY, Zenly and the Individual Defendants had completed their part of the plan.  Benchmark Capital, Mr. Fenton and Mr. Lasky had completed their part of the plan by convincing their respective colleagues on the board of directors of Snap and Zenly to approve the Zenly/Snap Deal.  Thus, as a direct and

proximate result of the misappropriation of YouMap's Trade Secrets, Snap acquired Zenly in May 2017.

111.   Snap described Zenly as a company that develops a location-based social media application that allows users to see where their friends are on a map.  Snap's stated purpose for the acquisition was to enhance the functionality of SNAPCHAT.  Snap's stated purpose is false and misleading, as Snap had already completed internal development of SNAP MAP and, according to reports from various employees, Zenly's software technology before Zenly's misappropriation of the Trade Secrets was not necessary.

112.   The total consideration paid by Snap in the Zenly/Snap Deal was $213.3 million in cash, of which $196.1 million represented purchase consideration and included $186.8 million in cash paid to the sellers of Zenly and $9.3 million of liabilities due to the sellers of Zenly.  The remaining $17.2 million of total consideration transferred represents compensation for future employment services.  The allocation of that purchase price was preliminary and was subject to additional information related to the liabilities that existed as of the acquisition date. The preliminary allocation of the total purchase consideration for the Zenly/Snap Deal was estimated as follows:

|  | TOTAL (in thousands) |
|---|---|
| Cash | $   $22,610 |
| Technology | $     23,000 |
| Goodwill | $   154,353 |
| Net deferred tax liability | $    (2,418) |
| Other assets acquired and liabilities assumed, net | $    (1,428) |
| Total | $   **196,117** |

113.   Because the Trade Secrets were stolen, Zenly did not have sufficient rights to assign or transfer any right, title or interest in or to the Trade Secrets to Snap (or any other party),

and, by extension, Snap never acquired any right, title or interest in or to the Trade Secrets purportedly acquired from or in Zenly.

114.    As a direct and proximate cause of Defendants' unlawful conduct, YouMap has suffered and continues to suffer substantial damages.

**CLAIMS FOR RELIEF**

**COUNT I**

**THE DEFEND TRADE SECRETS ACT (18 U.S.C. § 1836)**

115.    Plaintiff incorporates paragraphs 1 through 114 of this First Amended Complaint as if fully set forth herein.

116.    Defendants' conduct constitutes a violation of The Defend Trade Secrets Act, 18 U.S.C. §1836 (the "**DTSA**").

117.    Plaintiff is the owner of the Trade Secrets, which are related to services used or intended for use in interstate or foreign commerce.  The Trade Secrets constitute "trade secrets" as that term is defined in the DTSA at 18 U.S.C. §1839(3).

118.    The DTSA specifically defines "trade secrets" as comprising:

> all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, *formulas*, *designs*, prototypes, *methods*, techniques, *processes*, *procedures*, *programs*, or codes, whether tangible or *intangible*, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing if— (A) the owner thereof has taken reasonable measures to keep such information secret; and (B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information [18 U.S.C. §1839(3) (emphasis supplied)].

119.    The Trade Secrets derive "independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information." 18 U.S.C.1839(3).

120.    Plaintiff has taken reasonable measures to keep the Trade Secrets secret.

121.    Plaintiff only allowed access to and disclosure of the Trade Secrets subject to confidentiality, non-use, and nondisclosure restrictions in the Confidentiality Agreement.

122.    Defendants access to the Trade Secrets was unauthorized.

123.    Defendants misappropriated, as that term is defined in the DTSA at 18 U.S.C. 1839(5), the Trade Secrets by knowingly acquiring the Trade Secrets through improper means, namely, by making false statements and breaching contractual obligations to maintain the confidentiality of the Trade Secrets, not to use or disclose same, and/or fraudulently inducing Plaintiff to disclose the Trade Secrets in a manner inconsistent with Plaintiff's reasonable measures to keep the Trade Secrets secret and maintain confidentiality and secrecy of same.

124.    Defendants further misappropriated the Trade Secrets by using the Trade Secrets without Plaintiff's express or implied consent.

125.    The Trade Secrets have substantial economic value and have conferred an unfair, wrongful competitive advantage to Defendants.

126.    Defendants have and will continue to recklessly and maliciously misappropriate and the Trade Secrets through their continued use of same.

127.    As a direct and proximate cause of Defendants' current and continued misappropriation of the Trade Secrets, Plaintiff will suffer imminent and irreparable harm and, alternatively, has suffered substantial damages.

128.    Plaintiff has no adequate remedy at law. Unless enjoined by this Court, Defendants' acts of misappropriation will continue and Plaintiff will continue to suffer irreparable harm.

**COUNT II**

**DELAWARE UNIFORM TRADE SECRETS ACT, 6 DEL. C. §2001, ET SEQ.**

129.    Plaintiff incorporates paragraphs 1 through 128 of this First Amended Complaint as if fully set forth herein.

130.    Defendants' misappropriation of Plaintiff's Trade Secrets as described herein constitutes a violation of the Delaware Uniform Trade Secrets Act, 6 Del. C. §2001, et seq. (the "DUTSA")

131.     As a direct and proximate cause of Defendants' current and continued willful and malicious misappropriation of the Trade Secrets under the DUTSA, Plaintiff will suffer imminent and irreparable harm and, alternatively, has suffered substantial damages.

132.    Plaintiff has no adequate remedy at law. Unless enjoined by this Court, defendants' acts of misappropriation will continue and Plaintiff will continue to suffer irreparable harm.

**COUNT III**

**BREACH OF CONTRACT**

133.    Plaintiff incorporates paragraphs 1 through 132 of this First Amended Complaint as if fully set forth herein.

134.    The Individual Defendants that participated in the Beta Testing entered into the Confidentiality Agreement with sufficient consideration.

135.    The Individual Defendants breached the Agreement.

136.   As a direct and proximate cause of the foregoing, Plaintiff has suffered and continues to suffer and incur substantial damages.

**COUNT IV**

**TORTIOUS INTERFERECE WITH CONTRACTUAL RELATIONSHIP**

137.   Plaintiff incorporates paragraphs 1 through 136 of this First Amended Complaint as if fully set forth herein.

138.   The Confidentiality Agreement entered into by and between YouMap, on the one hand, and the Individual Defendants, on the other hand, was a valid and existing contract between the respective parties thereto.

139.   Zenly and Snap had knowledge of the Confidentiality Agreement by and between YouMap and the Individual Defendants and the terms and conditions under which the Individual Defendants contractually obligated themselves.

140.   Zenly and Snap intentionally interfered with the contractual obligations of the Individual Defendants under the Confidentiality Agreement, thereby causing the Individual Defendants to breach various terms and conditions of the Confidentiality Agreement.

141.   Alternatively, the intentional actions by Zenly and Snap were a significant factor in causing the Individual Defendants to breach various terms and conditions of the Confidentiality Agreement.

142.   The actions by Zenly and Snap in causing or comprising a contributing factor in the breach of various terms and conditions of the Confidentiality Agreement by the Individual Defendants was done without justification.

143.   As a direct and proximate cause of the foregoing, Plaintiff has suffered and continues to suffer and incur substantial damages.

**C**OUNT **V**

**INFRINGEMENT OF U.S. PATENT NO. 10,616,727**

144.     Plaintiff incorporates paragraphs 1 through 143 of this First Amended Complaint as if fully set forth herein.

145.     This is a claim by plaintiff YouMap, Inc. for patent infringement arising under the Patent Laws of the United States, 35 U.S.C. §1, et seq. alleging infringement of U.S. Patent No. 10,616,727 ("the '**727 Patent**") by Defendants Snap, Inc. ("**Snap**") and Zenly SAS and Zenly Inc. (together, Zenly SAS and Zenly Inc. referred to as "**Zenly**").  The '727 Patent is attached to this First Amended Complaint as Exhibit A.

**JURISDICTION AND VENUE**

146.     The Court has jurisdiction of this infringement action under 28 U.S.C. §§1331 and 1338(a).

147.     Upon information and belief, Defendants Snap and Zenly are doing business and committing infringements in this judicial district and each are subject to personal jurisdiction in this judicial district.

148.     Venue is proper in this judicial district pursuant to 28 U.S.C. §§ 1391 and 1400(b).

**THE PATENT**

149.     On April 7, 2020, U.S. Patent No. 10,616,727 (*i.e.*, the '727 Patent) was duly and legally issued to YouMap, the applicant on the application resulting in the '727 Patent for an invention entitled "System and Method for Location-Based Content Delivery and Visualization."

150.     The '727 Patent pertains to and is directed towards systems and methods for providing location information on a social network.

151.    Claim 11 is a representative claim of the '727 Patent.  Claim 11 claims a method for providing location information on a social network, comprising the following steps:

receiving, from a client device, a request for one or more social media posts, wherein the request includes screen attribute information about a display of the client device, geographic location information, and an identification of a requesting account of the social network;

identifying a set of temporally recent social media posts based on the screen attribute information and the geo-graphic location information;

applying, by a computer processor, two sets of grouping criteria to the set of social media posts to generate a suggested group, wherein:

the suggested group is a subset of the set of social media posts, and

applying the two sets of grouping criteria comprises:

generating a combined ranking based on:

ranking each social media post of the set of social media posts according to a first customized score for each social media post, wherein the first customized score is based on a set of preference factors, corresponding to the requesting account, applied to a general score of each social media post, and

ranking each social media post of the set of social media posts according to a second customized score for each social media post, wherein the second customized score is based on a second set of preference factors, corresponding to the requesting account, applied to the general score of each social media post, and

selecting, based on the combined ranking, the subset of the set of social media posts for inclusion in the suggested group, wherein the selecting comprises excluding at least one social media post of the set of social media posts from inclusion in the suggested group based on the combined ranking; and

providing, in response to the request, the suggested group for display by the client device.

152.    Defendant Snap has and still is directly infringing the '727 Patent at a minimum,

by making, using, selling, distributing and offering for sale and distribution in this judicial district its SNAPCHAT social media app which incorporates the SNAP MAP module and feature in a manner defined by the claims of the '727 Patent without permission from YouMap. Among other things, and by way of example only, Snap has and still is making its SNAPCHAT social media app that incorporates the SNAP MAP module available for download and use on Apple, Inc.'s iPhone via the "App Store" and on mobile devices using Google, Inc.'s Android operating system via "Google Play."

153.    Defendant Zenly has and still is directly infringing the '727 Patent at a minimum by making, using, selling, distributing and offering for sale and distribution in this judicial district its ZENLY social media app in a manner defined by the claims of the '727 Patent without permission from YouMap.  Among other things, and by way of example only, Zenly has and still is making its ZENLY social media app available for download and use on Apple, Inc.'s iPhone via the "App Store" and on mobile devices using Google, Inc.'s Android operating system via "Google Play."

154.    Upon information and belief, Defendants Snap and Zenly have infringed and continue to infringe the '727 Patent elsewhere in the United States.

155.    Defendants Snap and Zenly have caused and will continue to cause Plaintiff substantial damage and irreparable injury by virtue of their continuing infringement of the '727 Patent.

156.    Plaintiff is entitled to recover from Defendants Snap and Zenly the damages sustained by Plaintiff as a result of Snap and Zenly's wrongful acts in an amount subject to proof at trial and an injunction preventing Snap and Zenly from their wrongful acts of infringement.

157.    Upon information and belief, and after an opportunity for further discovery,

Defendant Snap and Zenly's infringement of the '727 Patent is willful and deliberate.

**WHEREFORE**, Plaintiff You Map Inc. demands entry of judgment against Defendants as follows:

**AS TO COUNTS I-IV:**

1.      Equitable relief in the form of declaratory judgment that the Trade Secrets, as same are identified and defined in this First Amended Complaint, and as further established by and through discovery in this litigation, are the sole and exclusive property of Plaintiff;

2.      Temporarily, preliminarily, and permanently enjoining and restraining each of the Defendants and their respective employees, agents, officers, directors, attorneys, successors, affiliates, subsidiaries and assigns, and all those in active concert and participation with each of them, from using the misappropriated Trade Secrets, in whole or in part, and directing each of the Defendants to recall and destroy any and all copies and versions of SNAPCHAT, SNAP MAP and ZENLY, whether in source, compiled or machine code, including all copies and versions of same previously distributed by Defendants to any third party for downloading, access or use.

3.      Finding that Defendants have engaged in unfair competition in violation of The Defend Trade Secrets Act;

4.      Finding that Defendants have engaged in unfair competition in violation of Delaware Uniform Trade Secrets Act;

5.      Finding that Defendants are liable to Plaintiff on all counts of this First Amended Complaint;

6.     Awarding to YouMap its actual losses; monetary damages; reliance damages; incidental damages; consequential damages; punitive damages; disgorgement of Defendants' ill-gotten profits; treble damages; an accounting; restitution; the reasonable value of goods and services; specific performance; equitable relief; attorneys' fees, including under 15 U.S.C. § 1117, 18 U.S.C. § 1836(3)(D); exemplary damages under 18 U.S.C. § 1836(3)(C); a reasonable royalty under 18 U.S.C. § 1836(3)(B); constructive trust; prejudgment interest; post judgment interest; costs; and such other and further relief as the court deems just and proper.

**AS TO COUNT V:**

1.     Equitable relief in the form of a declaratory judgment that the '727 Patent is valid and enforceable;

2.     Equitable relief in the form of a declaratory judgment that Defendants Snap and Zenly, each and both of them, have infringed the '727;

3.     A preliminary and permanent injunction against Defendants Snap and Zenly, each and both of them, and each of their respective officers, agents, servants, employees, and attorneys, all parent and subsidiary corporations, their assigns and successors in interest, and those persons acting in active concert or participation with them, including distributors and customers, enjoining and restraining them from continuing acts of infringement of the '727 Patent;

4.     An accounting for damages under 35 U.S.C. §284 from each of Defendants Snap and Zenly for their respective infringement of the '727 Patent, and the award of damages ascertained against each of the Defendants Snap and Zenly in favor of Plaintiff, together with interest as provided by law;

5.    Award of the Plaintiff's costs and expenses; and

6.    Such other and further relief as this Court may deem proper, just and equitable.

### DEMAND FOR A JURY TRIAL

Plaintiff You Map Inc. hereby demands a jury trial on all issues triable by a jury.


<u>Dated</u>: February 8, 2021                 Respectfully submitted,


**STAMOULIS & WEINBLATT LLC**

<u>/s/ Stamatios Stamoulis</u>
Stamatios Stamoulis
    stamoulis@swdelaw.com
Richard C. Weinblatt
    weinblatt@swdelaw.com
800 N. West Street, Third Floor
Wilmington, DE 19801
(302) 999-1540

**GORA LLC**

Richard Gora
    rich@goralaw.com
    (203) 424-8021
Sinead Rafferty*
    sinead@goralaw.com
    (646) 298-8523
2 Corporate Dr., Suite 210
Trumbull, CT 06611
*Admitted Pro Hac Vice*

**ATTORNEYS FOR THE PLAINTIFF**
**YOU MAP INC.**